UNITED STATES of America,
Appellee,

v.

Luther Joseph WIESNER,
Defendant-Appellant.

No. 90, Docket 22978.

United States Court of Appeals
Second Circuit.

Argued Oct. 11, 13, 1954.

Decided Nov. 8, 1954.

J. Edward Lumbard, U. S. Atty., New York City (Leonard B. Sand and Leonard Maran, Asst. U. S. Attys., New York City, of counsel), for appellee.

Rudolph Stand, New York City, for defendant-appellant.

Before CHASE, MEDINA and HARLAN, Circuit Judges.

HARLAN, Circuit Judge.

The appellant Wiesner appeals from a judgment of conviction entered upon a verdict of guilty by a jury under an indictment charging him, Manuel Barrios, Warren L. Knotts, and others to the Grand Jury unknown with conspiracy to violate the Gold Reserve Act of 1934 and the Treasury Regulations made thereunder and to defraud the United States with respect to the exercise of its functions in administering the Gold Reserve Act and Regulations, in that they would acquire, hold, transport, offer to sell and dispose of more than 35 troy ounces of fine gold, at any one time, without a license. 18 U.S.C.A. § 371, 31 U.S.C.A. §§ 440–443, Treas.Gold Regs. §§ 54.21, 54.22, 54.23. Knotts pleaded guilty at the opening of the trial, Barrios was acquitted by the jury, and Wiesner was found guilty and sentenced to 6 months imprisonment and a fine of $2500.

So far as material here, the Gold Reserve Act and Regulations prohibit the acquisition, holding, and disposition of fine gold, in quantities exceeding 35 troy ounces, except in accordance with licenses issued by the Secretary of the Treasury. Violations of the Act or Regulations carry civil penalties only, no criminal sanctions being provided. The transaction of which Wiesner was convicted related to a scheme participated in by Knotts, Barrios and Wiesner to acquire unlicensed gold, in excess of 35 troy ounces, and to sell it to a purported representative of the Israeli Government (actually a U. S. Customs Agent) in New York City, the transaction being frustrated by the arrest of the three defendants as the sale was about to be consummated on January 16, 1950.

In brief, the evidence showed the following: In December, 1949, Pena, a Customs Agent—unknown to the defendants as such—met Barrios who told him he had 20,000 ounces of gold for sale. Pena said he had an Israeli "friend" who was interested in buying gold, and shortly thereafter, on January 12, 1950, brought Barrios into contact with Customs Agent Eisenberg, whom he introduced as "Mr. Finkelstein." Negotiations ensued for the sale by Barrios to "Finkelstein" of 1500 ounces of gold a week, the price for the first lot to be $40.50 an ounce, the "official" and "street" prices of gold at the time being respectively $35.20 and $37.50 to $38.25 an ounce. Barrios then communicated with Knotts, who testified that he informed Wiesner of the proposed transaction, and that Wiesner undertook to see whether he could supply the gold. After some delay, January 16, 1950 was fixed for the closing of the transaction, on which day Wiesner met Knotts on the corner of 59th Street and Lexington Avenue with a brief case, later found to contain something over 150 ounces of gold. Knotts took Wiesner to the office of Barrios, whom Wiesner then met for the first time. Wiesner opened the brief case, displayed several packages of gold, and the Agents thereupon arrested Knotts, Barrios and Wiesner.

Wiesner's defense in substance was that he was not a participant in an illegal transaction. He testified that he had not brought the gold to the Barrios office to sell, and that in holding it he was acting for another, Genuth, whom he had assumed to have a gold license. He also testified that when Knotts, following his discussion with Barrios, contacted him to inquire whether he had any gold, he, Wiesner, told him that he was going into the business of making rings with Genuth, and that they had bought some gold for this purpose; that Knotts had said that he had someone who would cast rings right away; and that an appoint-

ment was made between them to meet on the Lexington Avenue street corner on January 16. There was evidence of discussions between Wiesner and Genuth late in 1949 as to their going into the business of manufacturing rings, Wiesner testifying that Genuth agreed to put 90 ounces of gold into the venture and that Genuth had stated to him that he should not worry about a license. There was also evidence that prior to Knotts' contacting Wiesner, the latter had talked with one Felicetti about casting some rings for him, that Felicetti undertook to procure 30 ounces of gold, sufficient for 50 rings, and that Wiesner had asked Felicetti to obtain an additional 30 ounces, so that 100 rings could be made. It was testified that when Wiesner asked Felicetti to obtain the additional 30 ounces of gold, Felicetti turned over the first 30 ounces to Wiesner since, being without a license, he could not hold more than 35 ounces of gold at one time. As to the second 30 ounces, Felicetti gave Wiesner an order on another concern to deliver the gold to Wiesner, apparently for Felicetti's account. Wiesner, however, kept the gold, having paid Felicetti for it, as he had for the first 30 ounces. The rings were never made by Felicetti, and the entire 60 ounces turned out to be part of the gold delivered to Barrios' office on January 16.

There was evidence from which the jury might conclude that Wiesner's version of his part in the Barrios transaction was a fabrication. The acquisition of the 60 ounces of gold by Wiesner through Felicetti was reflected by records which the jury might conclude were designed to cover up the real nature of the transactions. When arrested, Wiesner stated that he had procured the other 90-odd ounces of gold in the brief case from a person named Oliver, but on the trial he testified he got *all* the gold from Genuth, whom he evidently believed to be dead. The Government produced Genuth, however, as a rebuttal witness. Genuth testified that he had never given or received any gold from Wiesner, but that he had given him $5500 for investment in a ring manufacturing enterprise. He stated that he had later demanded his money back, but never received it.

The trial Judge charged the jury that "if you have any reasonable doubt as to whether Wiesner understood before going to Barrios' office on January 16, 1950, that he agreed to go there to sell gold, then you must acquit the defendant Wiesner." The jury evidently disbelieved Wiesner. Judge Leibell also fully and correctly charged the jury on the law of entrapment, as to which the appellant claims no error on this appeal.

■ The appellant puts forward two grounds for reversal of his conviction. The first is that a conspiracy to violate the Gold Reserve Act and Regulations is not an indictable offense, in that such violations are not an "offense against the United States" within the meaning of the general conspiracy statute, 18 U.S.C. A. § 371. The second is that the evidence was insufficient to justify appellant's conviction.

The first point is foreclosed by United States v. Hutto, 1921, 256 U.S. 524, 41 S.Ct. 541, 65 L.Ed. 1073, unless, as appellant contends, the 1948 revision of the Criminal Code has deprived the Hutto case of vitality. Hutto decided "that a conspiracy to commit any offense which by act of Congress is prohibited in the interest of the public policy of the United States, although not of itself made punishable by criminal prosecution, but only by suit for penalty, is a conspiracy to commit an 'offense against the United States' within the meaning of section 37, Criminal Code [now § 371], and, provided there be the necessary overt act or acts, is punishable under the terms of that section." 256 U.S. at page 528, 41 S.Ct. at page 543. The "offense" involved in Hutto was a violation of Rev. Stat. § 2078, 25 U.S.C.A. § 68, prohibiting any person employed in Indian affairs from having any interest in any trade with the Indians, except for the account of the United States, under pain of a civil penalty and removal from office.

742

Until 1948 the general conspiracy statute embraced, as it still does, both conspiracies to commit an "offense" against and to "defraud" the United States. The statute provided a maximum prison punishment of two years, irrespective of whether the conspiracy was to commit an "offense" or to "defraud," and if the former, no matter whether the substantive offense was itself a felony, misdemeanor, or non-criminal infraction. See 35 Stat. 1096, § 37. In the 1948 revision § 37 was amended so as to increase the maximum prison sentence from two to five years, with the proviso that where the object of the conspiracy is to commit a misdemeanor the sentence shall not exceed the maximum punishment provided for the substantive offense, 18 U.S.C.A. § 371. The appellant argues that in consequence of the 1948 amendment a person may no longer be indicted, as here, for a conspiracy to commit a non-criminal offense, and that the Hutto case is out of date. We do not agree.

The 1948 amendment was primarily directed to the penalty provisions of § 37, and we find nothing to indicate an intention to eliminate non-criminal offenses, which Hutto had held to be embraced by the statute, and thus narrow the reach of the Section. Indeed, by including conspiracies against "any agency [of the United States]" the scope of the statute was, if anything, broadened. Our view of the statute is not affected by § 1 of Title 18, 18 U.S.C.A. § 1, which defines felonies, misdemeanors, and petty offenses in terms of the criminal penalties imposed. Treating this Section as an exclusive definition of offenses against the United States, the appellant argues that civil violations which carry no criminal sanction are no longer to be regarded as "offenses against the United States" as that term is used in § 371. This is said to be especially so since the classification contained in § 1 is stated to apply "Notwithstanding any Act of Congress to the contrary * * *." But § 1 will not sustain that meaning. Its purpose was simply to resolve the conflict which previously existed over whether the definition of felonies and misdemeanors formerly contained in 28 U.S.C.A. § 541 (which incidentally was in effect at the time of Hutto) or the denomination given an offense under the specific statute proscribing it should be considered as controlling. See Reviser's Note, 18 U.S. C.A. § 1.

■ It is true that the construction which we think § 371 must bear is anomalous in that a conspiracy to commit a non-criminal "offense" may carry a greater punishment than a conspiracy to commit a misdemeanor. Even so, we would not be justified in giving the 1948 amendment an unnatural construction. The cure for this anomaly may well be something which the Congress will wish to consider, but the courts must take the statute as they find it.

In this instance, the impact of the anomaly upon the defendant has been mitigated, since the trial Judge sentenced him to half of what would have been the maximum prison sentence for a misdemeanor, stating that but for the anomaly in the statute he would have imposed a longer term of imprisonment. Moreover, Judge Leibell specifically instructed the jury that the indictment charged both a conspiracy to commit an offense and to defraud, but that they should return a single verdict; and the same evidence went to both branches of the indictment. In view of that, we think the jury's verdict is properly to be taken as including a finding of conspiracy to defraud which, under 28 U.S.C.A. §§ 371 and 1, is a felony. Therefore, the defendant might have been sentenced to a prison term of five years.

■ The contention that the evidence was insufficient to warrant conviction must also fail. There is evidence from which the jury might have concluded that Wiesner had agreed with Knotts to engage in a transaction which Wiesner knew to be unlawful, and that acts in furtherance of the agreement had been committed. This was ample to sustain the conviction for conspiracy to commit an offense against the United States.

There was also evidence in Wiesner's dealings with Felicetti of the trickery and deceit necessary to sustain a conviction for conspiracy to defraud the United States in the performance of a governmental function. Hammerschmidt v. United States, 1924, 265 U.S. 182, 186–187, 44 S.Ct. 511, 68 L.Ed. 968. While in some respects the evidence was in conflict, it was for the jury to decide where the truth lay.

■■ It is argued that it is incongruous that the jury should have convicted Wiesner while acquitting Barrios. But it may well be that the jury considered Barrios' defense of entrapment well founded. It is of course of no consequence that Wiesner did not know the identity of Barrios until the day of their arrest. Blumenthal v. United States, 1947, 332 U.S. 539, 556, 68 S.Ct. 248, 92 L.Ed. 154.

Judgment affirmed.