GAF CORPORATION, Plaintiff,

v.

Paul MILSTEIN, Seymour Milstein, Gloria Milstein Flanzer and Morris Milstein, Defendants.

No. 70 Civ. 5502.

United States District Court,
S. D. New York.

March 22, 1971.

Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiff by Edwin J. Wesely, and Richard A. Horgan, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for defendants; Louis Loss, Cambridge, Mass., David Sher, David Lubart, Charles G. Moerdler, Gerald D. Fischer, Stephen Block, New York City, of counsel.

POLLACK, District Judge.

The defendants have moved for a dismissal of the complaint pursuant to Fed. R.Civ.P. 12(b) (6) [1] on the ground that the first and second counts set forth in the complaint fail to state a claim upon which relief can be granted.

The two counts in the complaint respectively charge that the defendants constitute a group in violation of Sections 13(d) and 10(b) of the Securities and Exchange Act of 1934, as amended,[2]

---

[1]. Or, in the alternative, summary judgment pursuant to Fed.R.Civ.P. 56.

[2]. 15 U.S.C. § 78a et seq. For simplicity, it will be called the Exchange Act. Effective July 29, 1968, the Williams Bill amended the Exchange Act and enacted the statutes to be referred to herein. Pub. L.No. 90-439, 82 Stat. 454 (1968).

for failing timely to file a Schedule 13D [3] required by Section 13(d) and for making material misstatements and omissions in the Schedule 13D that they did eventually file.

The four defendants are related, three of them children of the fourth. They hold approximately 324,166 shares of GAF Corporation convertible preferred stock,[4] constituting 10.25% of the outstanding shares of that class. These shares were acquired as an outgrowth of the acquisition by GAF of the Ruberoid Company in 1967. At the time of the GAF-Ruberoid merger, defendants owned about 8% of Ruberoid's common stock while GAF owned 26%. As part of the merger, the GAF holdings in Ruberoid were cancelled and defendants' holdings automatically rose from approximately 8% (in Ruberoid) to slightly more than 10% (of GAF preferred) solely by reason of GAF's cancellation of its own holdings. Since obtaining their preferred shares in the merger proceedings, the defendants have not acquired any additional shares of GAF preferred.

The only securities of GAF purchased by defendants since the merger are approximately 209,300 shares of common stock, a different class, or 1.6% of the total number of outstanding shares of that class. The total voting power of defendants in GAF (preferred and common vote together) approximates 4%.

Plaintiff alleges that defendants, acting in conspiracy, determined to take over GAF sometime after July 29, 1968, the effective date of the Williams Bill. The plaintiff claims that Section 13(d) [5] obligated defendants to file Schedule 13D within ten days after this group was formed. Instead, says plaintiff, the defendants failed to file Schedule 13D un- til September 24, 1970, which plaintiff says was untimely filing. (The defendants contend that they are not subject to Section 13(d) and that their filing of a Schedule 13D was purely voluntary). GAF additionally claims that the Schedule 13D that was filed, as well as amendments, contained *inter alia* deliberately false and misleading statements to conceal the take-over conspiracy and plans of the group.

The plaintiff contends that the violations have caused and continue to cause irreparable injury to GAF's shareholders and the investing public and such irreparable harm will continue unless defendants and others allegedly conspiring with them are enjoined from their unlawful activities.

In its prayer for relief, the plaintiff seeks both a preliminary and permanent injunction against the defendants preventing them from acquiring any shares of any class of GAF stock; soliciting any proxies to vote GAF stock; voting any shares of GAF stock acquired during the conspiracy; and otherwise acting in furtherance of the alleged conspiracy. This relief is requested to be operative until the effects of the alleged conspiracy have been fully dissipated and the alleged unlawful acts fully corrected.

The ultimate issue presented by the defendants' motion to dismiss the first count is whether, organizing a group of stockholders owning more than 10% of a class of equity securities with a view to seeking control is, without more, a reportable event under Section 13(d) of the Exchange Act; and as to the second count, whether in the absence of a connected purchase or sale of securities, the target corporation claiming vio-

---

3. The statute requires the Schedule 13D to be sent to the issuer and each Exchange where the securities in question are traded as well to be filed with the Securities and Exchange Commission. § 13(d) (1). For simplicity, this duty will be referred to as filing with the Commission.

4. This figure excludes 28,808 trust shares as to which defendants disclaim beneficial ownership.

5. Sections cited herein refer to the Exchange Act, as amended.

lation of Section 10 and Rule 10b(5)[6], has standing to seek an injunction against a control contestant for falsity in a Schedule 13D filing.

At the threshold, it is well to note that the congressional purpose of the Exchange Act was "to provide for regulation and control" of "transactions in securities" and "to insure the maintenance of fair and honest markets in such transactions." § 2.

### I.

The Williams Bill was added to the Exchange Act on July 28, 1968. It had its genesis in the wave of cash tender offers that had become increasingly popular in the years immediately preceding enactment. There was an increasing use of the cash tender offer to acquire control of corporations. Existing legislation did not require disclosure to investors of facts concerning the offeror, and a need was felt to enact legislation which would require disclosure to shareholders not only by those making cash tender offers but also by substantial holders entering into the securities markets to acquire stock of a target company. Means were sought by Congress to help maintain honest securities markets and to insure that public investors have truthful information on which to make investment decisions.

Accordingly, the Williams Bill, effective July 29, 1968, required the filing of public information in response to prescribed questions, if, a tender offer for an equity security of a publicly held company would result in beneficial ownership of more than 10 percent[7] of the securities of that class. § 14(d) (1). In addition, with an exemption to be mentioned later, the Williams Bill required a similar report—even if no tender offer is made—by any person who after acquiring securities of the class is the beneficial owner of more than 10% of

the class. § 13(d) (1). The public report must be made "within ten days after such acquisition." This requirement applies to persons who beneficially have owned more than 10% of a class before the acquisition of additional stock as well as to persons who become the beneficial owners of more than 10% of the class as a result of the acquisition. *See* SEC Release of August 30, 1968, CCH Fed. Sec.L.Rep. ¶ 77,597; Release of January 18, 1971, CCH Fed.Sec.L.Rep. ¶ 77,946. When the purpose of such a person's "prospective purchases" is to gain control, he must disclose his "plans" to liquidate, merge, or make any other major change in the target company's business or structure. § 13(d) (1) (C). Moreover, under Schedule 13D, such a person must disclose, in any event, just what the "purpose or purposes of the purchase or proposed purchase of securities of the issuer" is.[8] The schedule covers past, prospective and proposed purchases.

The relevant provisions of the statutes involved are:

(d) (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title * * *, is directly or indirectly the beneficial owner of more than 10 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe * *.

(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Com-

---

6. 17 C.F.R. § 240.10b–5.

7. Now 5% pursuant to Pub.L.No.91–567, 84 Stat. 1497 (1970). During the relevant period the operative figure was 10%,

which will be used below unless otherwise noted.

8. 17 C.F.R. § 240.13d–101, Item 4.

mission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

(5) The provisions of this subsection shall not apply to—

(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class.

The statute is clearly designed to treat persons acting in concert as if the group were an individual. The sponsor, Senator Williams, explained the reason for this in introducing the bill:

This definition would successfully close the loophole that now exists which allows a syndicate, where no member owns more than 10 percent, to escape the reporting requirements of the Securities Exchange Act. 113 Cong.Rec. S445 (daily ed. Jan. 18, 1967).

On its face Section 13(d) (1) clearly does not apply, in respect of an individual, in the absence of an acquisition of securities subsequent to the enactment of that law. The statute says that "any person who, *after acquiring* * * * ownership of any equity security of a class * * * is * * * the * * * owner of more than 10 per centum of such class shall, * * *" (emphasis added). However, if the purchases are of less than 2% of the shares of a class within a 12 month period, they are exempt and do not create a reportable event. § 13(d) (5) (B).

The plaintiff forcefully urges, however, that a group should be treated differently from an individual and that if a group is organized with a view to control, it must report if its total holdings of a class are more than 10% of the outstanding shares even though no one in the group makes any purchases after the creation of the group. Statutory authority for such a position is thought to be found in Section 13(d) (3) which treats a group as an individual. From there, plaintiff claims that a constructive conveyance of the shares from the individual to the group occurs and results in an "acquisition" when the group is formed, thus allegedly complying with the language of *after acquiring* in Section 13(d) (1).

The statute does not define "acquisition" (other than to exempt 2% of the class from the requisite acquisition) nor does it unequivocally state that the words "after acquiring" are to be understood to refer only to acquisitions taking place after the effective date of the Williams Bill. Moreover, both Houses of Congress expressly stated that the group would be deemed to have become beneficial owners of the shares held by its individual members and that a filing would consequently be required upon formation of the group, whether or not any member of the group had acquired securities at that time. Each committee report stated as follows:

[Section 13(d) (3)] would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert. Consequently, the group would be required to file the in-

formation called for in section 13(d)(1) within 10 days after they agree to act together, whether or not any member of the group had acquired any securities at that time. This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership of securities by reason of any contract, understanding, relationship, agreement or other arrangement. S.Rep. No.550, 90th Cong., 1st Sess. 8 (1967); H.R.Rep.No.1711, 90th Cong., 2d Sess. 8–9 (1968).

It is easy to see how the strong language in the committee reports gives a superficial acceptance to plaintiff's view that a filing is necessary upon formation of a group, without purchases. In fact, Professor Loss, a leading text writer in the securities area reported the statute in the terms of these congressional reports in his 1969 supplement:

> So far as both new filing provisions—§§ 13(d) and 14(d)—are concerned, a "class" consists of all the outstanding securities of the class exclusive of any held by or for the issuer or a subsidiary. §§ 13(d) (4), 14(d) (3); cf. Rule 16a–2(a), supra p. 3058. Again, two or more persons acting as a partnership "or other group" for the purpose of acquiring, holding or disposing of securities are considered a "person." §§ 13(d) (3), 14(d) (2). Any such group is considered to become the beneficial owner of more than 10 percent at the time its members agree to act in concert. Cf. pp. 705–06 supra (Sec. Act Rule 154(b)); pp. 1101–04 supra (Sec.Ex.Act § 16 (a)). Consequently, the group must file the information specified in § 13 (d) (1) within ten days after its members agree to act together, whether or not any member has acquired any security at that time. 6 Loss, Securities Regulation 3664 (Supp.1969).

Professor Loss has appeared herein as co-counsel for the defendants and has advised the Court that it is his present view that the reports do not appropriately reflect the law as enacted.

Legislative reports do not take precedence over clear statutory language; and any inquiry must "begin with the language of the statute itself." Jones v. Alfred H. Mayer Co., 392 U.S. 409, 420, 88 S.Ct. 2186, 2193, 20 L.Ed.2d 1189, 1197 (1968). "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." United States v. American Trucking Ass'ns., Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, 1350–1351 (1940); Movielab, Inc. v. Berkey Photo, Inc., 321 F.Supp. 806 (S.D.N.Y. 1970) (Mansfield, J.).

Legislative history is extremely useful for interpreting a statute when the Act's language is ambiguous. However, the legislative reports should not be resorted to here since the specific statutory language is clear and compels the construction that the reportable event is the acquisition of the requisite amount of shares and not the mere formation of a group with a view to control. The Supreme Court has said:

> Legislative materials may be without probative value, or contradictory, or ambiguous, * * * and in such cases will not be permitted to control the customary meaning of words * * or construction found by experience to be workable. United States v. Dickenson, 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356, 1362 (1940).

This is such a case in which the reports of Congress are at odds with the statute as it was enacted. In these circumstances, the words of the enactment control over the inconsistent explanation of those who described the statute.

It is not for the Court to speculate how or why the inconsistent congressional reports were made; the function of the Court is to administer the law as written by the Congress. The words of a statute are designed to give notice to the public and if the public is told that words do not mean what they say because of committee reports which are inconsistent, the public will have no way of insuring compliance with congression-

al dictates—if only because the public will have no idea which dictate to follow. In short, we do not legislate by committee report, we legislate by statute.

■ Not only does the statute require an acquisition before there need be a filing, but the language of Section 13(d)(3) indicates that groups are not to be treated differently from individuals.[9] It says:

> When two or more persons act as a partnership * * * or other group for the purpose of acquiring, holding, or disposing of securities * * *, such * * * group shall be deemed a "person" for the purposes of this subsection.

The statute was clearly intended to prevent persons acting in concert from concealing information important for investor protection by making transactions as individuals. But if a group is "deemed a 'person'", then a group need not do what an individual does not have to do.

Throughout our law we have statutes which make group action more "reprehensible" than individual action. A criminal conspiracy may occur when the same acts, if done by an individual, would not constitute a substantive crime because society has greater difficulty defending against concerted action. *E. g.,* United States v. Hutto, 256 U.S. 524, 41 S.Ct. 541, 65 L.Ed. 1073 (1921); United States v. Wiesner, 216 F.2d 739 (2d Cir. 1954). Similarly, restraints of trade may be more harmful if committed by two or more parties acting together than if done by one person. Sherman Act §§ 1, 2, 15 U.S.C. §§ 1, 2. But in the context of tender offers and corporate takeovers, the number of people involved is unimportant compared to the financial resources available to the insurgents.

A person of large financial resources can be a far greater threat to entrenched management than an entire family of substantially lesser means. It is money and not numbers that counts here.

GAF would force a group to file when it is created, yet when the group later purchases less than 2% of the outstanding shares of a class in a twelve month period, it need not amend its filing because of the exemption in Section 13(d)(5) (B). Conceivably, Congress may have felt that a first filing—when the group is formed—is more important to the public than later filings when a small amount of stock is purchased, but nowhere is it indicated that the legislators felt one filing is more significant than another. There is simply no statutory authority for saying that a group or an individual's purchase of not more than 2% is exempt, but a group must report when it makes no purchases at all.

Nowhere does the statute say that the formation of a group with a view to gaining control but without making any purchases of securities, triggers the filing requirement. That result cannot be achieved by attributing ownership of the members to the group, without any other purchase.

As was pointed out above, it is not for this Court to decide this case on the basis of what was best for Congress to do, but rather only on the basis of what Congress did.

The inherent difficulty of ascertaining when a group was formed is akin to an attempt to grasp quicksilver. In all probability, the usual case would present a continuous unfolding stream of events leading to the group's determination to attempt a take-over. At what stage then would Section 13(d) require a filing? In the instant litigation, for

---

9. Individuals who acquire their shares after the effective date of the Act will, of course, have to file. Therefore, the number of individuals holding their shares prior to enactment and thereby avoid filing will decline over time. Conceivably, a distinction can be drawn between groups whose members acquired shares prior to the effective date and those whose members acquired shares later, with groups whose members acquired no shares after July 29, 1968 not having to file since they are to be treated like individuals. However, this decision does not rest upon such a distinction.

example, all four defendants are close relatives and it is conceivable that the alleged conspiratorial agreement began as complaints voiced during a dinner or other family gatherings. These may have included or been followed by utterances against GAF management and the erosion of the investment value of defendants' stock interests. Yet, if it is determined later to read these complaints as the establishment of a group with intent to act, and the group has not filed timely, it is left open to a sweeping injunction as has been requested here.

A legal controversy to determine the birth date of the group, in the absence of trading in securities, is of no especial value to the maintenance of fair and honest markets. In contrast, the requirement to file, when the group has invaded the securities markets and acquired shares in excess of the 2% exemption, supplies a perfectly clear, reportable event keyed to the objects of the securities laws.

Plaintiff also calls attention to the language of Section 13(d) (3) defining a person as including a group formed "for the purpose of acquiring, *holding or disposing of* securities." (emphasis added.) If a filing is necessary only after acquiring securities, § 13(d) (1), then, according to plaintiff, *holding or disposing* has no meaning. To give effect to those words, plaintiff would require a group formed to hold securities—as defendants are alleged to have done here— to file. These words may have meaning in other contexts, but they certainly do not apply here. Section 13(d) (1) does not fix the filing date as the date when a group is said to become a holder or a seller of securities; it establishes acquisition as the reportable event.

An examination of the regulatory scheme of the Exchange Act indicates that the interpretation of the statute to require a non-exempt acquisition as the reportable event, is fully consistent with the statutory scheme found in Sections 13, 14 and 16 of the Exchange Act. As previously noted, the goals of the federal securities statutes are to provide freely and fairly functioning markets.

Each corporation whose shares are traded on a national securities exchange or otherwise registered with the Commission must file periodic reports with the Commission (which are available to the public). These reports, which must be filed monthly in some instances, are designed to keep investors apprised of material current events in companies whose stock is traded or held by a significant number of people. § 13(a); 17 C.F.R. § 240.13a–11(a).

Similarly, proxies to vote the shares of such companies cannot be solicited by either management or insurgents without furnishing the stockholder with material information. § 14(a); 17 C.F.R. § 240.-14a–3. These informational requirements cannot be avoided by management's failure to solicit proxies. § 14(c).

Prior to the passage of the Williams Bill, the investor protections given in proxy fights were missing when takeovers occurred by tender offers in which a "loser" could still frequently sell his holdings for a profit after the battle. *E. g.*, Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 791 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S. Ct. 41, 27 L.Ed.2d 50 (1970). Part of the Williams Bill, Section 14(d) (1) gives substantial investor protection by requiring disclosure of information directly to shareholders as well as to the Commission prior to *or* simultaneously with the tender offer. The statute could have required the filing in advance of the initiation of the tender offer.[10] But to do so, it was thought by some, would have given entrenched management an unwarranted advantage in a struggle for corporate control.

There are those among the experts and commentators who considered tender offers and stock acquisitions in pursuit

10. *See* S. 2731, 89th Cong., 1st Session (1965) (forerunner of the Williams Bill, requiring filing 20 days in advance of initiating a tender offer).

of control as a healthy process. Corporate Acquisitions by Tender Offer, 115 U.Pa.L.Rev. 317, 321–22, 360–71 (1967); A Note on Chilling Tender Solicitations, 21 Rutgers L.Rev. 309 (1966–67); Mergers and the Market for Corporate Control, 73 J.Pol.Econ. 110, 113 (1965). While management and its supporters cogently argued that managements need protection against the corporate raider, see Comment, Senate Bill 510 and the Cash Tender Offer, 14 Wayne L.Rev. 568, 585–86 (1968), the Williams Bill concentrated on an investor protection goal rather than on providing protection for management's ability to repel raiders.

Section 14(d), as it was enacted, gave no information to investors prior to the tender offer even though it was recognized that there could be occasions in which investors should have information prior to the tender offer. Section 13(d) filled the gap somewhat—it supplements Section 14(d) by requiring the public report of purchases of stock which exceed a prescribed minimum, 2% of the class, and result in holdings of 10% or more of the class—regardless of whether the acquisitions are followed by a tender offer or proxy contest.

■ The 2% exemption provided in Section 13(d) (5) (B) recognizes that such small purchases do not alter substantially the equilibrium between supply and demand and therefore the market price of the stock in question. It is significant that the exemption is phrased not in terms of the total values of purchases but in percentage terms, indicating that it is the relative effect of the purchases to the total shares outstanding that is important.[11] The inapplicability of the 2% exemption to sales indicates that Congress felt that sales at crucial times may be even more important than purchases when a tender offer is made, and therefore the holder must report any

material change in his holdings caused by disposing of securities. § 13(d) (2).

■ Similarly, a constructive "conveyance" from individuals to the group, by aggregating the holdings of a group, by itself does not affect the equilibrium between supply and demand and therefore cannot affect market values. The basic protection of Section 13(d) is to indicate who is behind large holdings that are created or supplemented by market trading, cf. Crane Co. v. Westinghouse, supra at 792–793, and showing the cause of various price movements is not needed when there have been neither open market purchases nor any tender offer. Requiring a group to file in such a situation, as plaintiff argues should be the case, is superfluous in the context of the Williams Bill's goals, if not counter to them altogether.

The Court realizes that holders of more than 10% of any class of securities must also register under Section 16(a). However, the purpose and operation of Section 16 are different from Section 13 (d). Section 16 insures that officers, directors, and large shareholders—the people most likely to have access to "inside" information—cannot use their positions to trade in securities to the disadvantage of the public and the corporation. This goal is achieved by requiring disgorging of any profits earned through short term holdings of the securities in question. § 16(b). To effectuate this disgorging of profits, filings must be made with the Commission whenever there is a change in holdings by those covered by Section 16(a). However, Section 16(a) requires the disclosure of changes in holdings within ten days of the close of a calendar month in which the changes take place. This means that in a quickly moving tender offer situation, transactions taking place at the beginning of a month need not be reported under Section 16(a) un-

11. Compliance with registration and filing requirements in the securities laws is grounded on both absolute and relative terms. *E. g.*, § 12(g) (1) of the Exchange Act; Rule 154(b) promulgated under the Securities Act of 1933, 17 C.F. R. § 230.154(b).

til forty days later—when the result of the tender offer is history. In contrast, Section 13(d) (2) requires disclosure of material changes in the facts set forth in filed statements as soon thereafter as the Commission requires by rule or regulation. The Commission's regulation in respect to any material change requires amendments to be "promptly file[d]" after the change occurs. Rule 13d–2, 17 C.F.R. § 240.13d–2.

The difference in the coverage and purposes between Section 13(d) and 16 (a) are highlighted by the recent amendment to Section 13(d) (1), not applicable to this litigation, reducing the holdings now required to be reported from 10% to 5%. Pub.L.No.91–567 (1970).

Reporting changes in holdings is also important in an attempted take-over by proxy fight if one contestant claims another has effected changes in stock prices.[12]

The only reported Court determination closely in point to the instant problem is Bath Industries, Inc. v. Blot, 427 F.2d 97 (7th Cir. 1970). The language of the Seventh Circuit opinion makes it seem that the Court determined that a group would· have to file when there is an agreement to acquire shares:

> [I]t is our conclusion that the Act should be interpreted to require compliance with its disclosure provisions when, but only when, any group of stockholders owning more than 10% of the outstanding shares of the corporation agree to act in concert *to acquire additional shares.* 427 F.2d at 109 (emphasis in original)

The Seventh Circuit itself recognized that the 2% exemption should be read into that statement. 427 F.2d at 111 n. 7.

The actual facts in the record of *Bath* were that no filing was made until after the litigation began; the group involved held in excess of 50% of the voting power; after the group was formed purchases in excess of the exempt limit were in fact made of securities of the applicable class; the Court mentioned that the statute required compliance within 10 days of the purchases; and the Court's mention in footnote 7 of the 2% exemption showed its actual reliance on purchases and not the mere organization of a group. Consequently, *Bath* must be read in the context of the facts there under adjudication; and the language used in the opinion presumably was not intended as an adjudication outside the situation presented.

Unlike the apparent situation in *Bath*, the Milstein family has bought but 1.6% of the outstanding shares of common stock *since the enactment of Section 13 (d)* and those shares are not even in the class of convertible preferred of which the defendants own more than 10%. Even under a broader interpretation of *Bath* than is warranted by its facts, the Milsteins need not have filed.

Congress clearly knew how to require holders to file without making any acquisitions. It did so in Section 16(a), but different language was used in Section 13(d) (1). As interpreted here, the Williams Bill *does* "close the loophole * * * which allows a syndicate, where no member owns more than 10% to escape the reporting requirement of the Securities Exchange Act." 113 Cong. Rec. S445 (daily ed. Jan. 18, 1967). A group can avoid filing under Section 13 (d) (1) *only if* it acquires no significant amount of securities after its creation. If there are no purchases after the creation of the group, there can be *no* take-

---

12. The Court notices that the letter sent by GAF's Board of Directors to shareholders on March 2, 1971 said inter alia: "[T]he Milsteins could not care less if GAF stock went *down* since they would then '*buy, buy, buy*'." While the defendant Milstein family has not had the substantial number of transactions required to trigger § 13(d) (1)'s reporting requirement, it is conceivable that substantial transactions, if disclosed, could explain price movements argued about in proxy fights. In another context, counsel for defendants said in oral argument that management should equally be required to disclose important information during a take-over fight.

over absent a proxy fight, where disclosure is guaranteed by Section 14(a) and the rules promulgated thereunder. If the purchases are made pursuant to a tender offer, there will be, of course, a filing under Section 14(d).

## II.

Turning now to GAF's claim that even if the Milsteins did not have to make a filing under Section 13(d) (1), the schedule that was filed was false and misleading and therefore in violation of Section 10(b) and Rule 10b–5 promulgated thereunder. Defendants move to dismiss this count on the ground that GAF has no standing because it is neither a purchaser nor a seller of shares in question and therefore does not come under the operative language of Rule 10b–5, "in connection with the purchase or sale of any security." *E. g.*, Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Birnbaum v Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L. Ed. 1356 (1952).

GAF answers that the complaint seeks only injunctive relief and that the purchaser-seller limitations of *Birnbaum* and its progeny apply only to actions at law. *E. g.*, Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967); Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 307 F.Supp. 910 (S.D.N.Y.1969) (Cannella, J.), aff'd on other grounds, 425 F.2d 842 (2d Cir. 1970); Christophides v. Porco, 289 F. Supp. 403, 406 (S.D.N.Y.1968) (Pollack, J.); Marino v. Coburn Corp., CCH Fed. Sec.L.Rep. ¶92,959 (E.D.N.Y.1971) (Dooling, J.).

Plaintiff says it is logical for a corporation to seek private enforcement of the Commission's rules and regulations when there are violations involving its own shareholders. J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969).

However, this is not a case in which an issuer is a disinterested party protecting merely the markets and its shareholders from fraudulent acts. There is an admitted fight for control of plaintiff between the defendants and entrenched management. A clear self-interest on the part of the moving parties takes such a controversy beyond the rationale which explains the corporation's vicarious standing to sue for an injunction, viz., an additional means of disinterested protection of the market place and of the stockholders' best interests. As the Court of Appeals noted in General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 164 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969):

> There are many practical advantages * * * in allowing a corporation in certain cases to enjoin manipulation of its stock, although courts must act both with speed and with caution lest such actions become vehicles for management to thwart purchases in the true interest of the stockholder.

Even if an issuer would otherwise be accorded standing to sue under Rule 10b–5, when management control as well as the integrity of the markets are sought to be conserved at the same time by the same prime movers, the conflicting interests dictate that the embattled management should not use the equitable assistance afforded by injunction to insure fair and free markets. It is generally inappropriate to impede a legitimate fight for the control of the management of a corporation. Where the corporate management faces a conflict of interest, and no direct connected interest of the corporation is to be vindicated by the suit, the protection of the objects of Rule 10b–5 through equitable intervention is better left to be administered by the federal administrative agency, the SEC, or other eligible complainants.

It is always possible that management will phrase a complaint in terms that indicate no control fight, to obtain standing under Rule 10b–5 if the corporation is otherwise to be granted standing. On

the other hand, defendants may try to avoid liability by insisting they are involved in a fight for control. In such a situation, it may be appropriate to allow the case to go to an evidentiary hearing to determine the true motivations of the parties. However, where the record is clear that there is a control fight, as the parties here concede, no hearing is needed to invoke the therapeutic rule that a conflict of interest will not be sanctioned by according to the management a standing to sue under Rule 10b-5 where the corporation's own interests are not at stake.

Another approach to the problem herein yields the same result. By including Section 14(e) in the Williams Bill, Congress indicated that "in respect to tender offers * * * there was no standing to sue under Rule 10b-5 by either the *tender offeror or by the target corporation.*" Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 969 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). Section 14(e) was only a codification of existing case law under Rule 10b-5 *"except perhaps for any bearing it may have on the issue of standing."* Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 940 (2d Cir. 1969) (emphasis added).

 The target corporation has standing under Section 14(e) if there are " * * * any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." § 14(e); Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 843 n. 1 (2d Cir. 1970); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969). The language does not cover fraudulent misstatements in a Section 13(d) filing when there is no tender offer. Levine v. Seilon, Inc., 69 Civ. 209 (S.D.N.Y.1969) (McLean, J.), aff'd on other grounds, 439 F.2d 328 (2d Cir. 1971).

Congress enacted Sections 13(d), 14 (d), and 14(e) at the same time. The standing accorded the target company in connection with Section 14(d), but lacking under Rule 10b-5, could easily have been extended to Section 13(d). The filing made under Section 14(d) even contains "the information specified in section 13(d)." § 14(d) (1). However, Congress chose not to extend the target company's standing to complain under the securities laws when, as here, no tender is ever made.

Nothing stated herein is intended to express any opinion on the merits of the claims asserted in the second count.

The complaint is dismissed.

So ordered.