**BANGOR PUNTA CORPORATION,**
**Plaintiffs,**

v.

**CHRIS–CRAFT INDUSTRIES, INC.,**
**et al., Defendants.**

**No. 69 Civ. 2354.**

United States District Court,
S. D. New York.

Dec. 10, 1971.

---

Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for plaintiff by James V. Ryan, William L. D. Barrett and C. Kenneth Shank, Jr., Nancy L. Pasley, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants by Arthur L. Liman, Joseph J. Ackell and Jack C. Auspitz, New York City, of counsel.

POLLACK, District Judge.

This cross action by Bangor Punta, a defendant in Chris-Craft v. Bangor Punta et al., 337 F.Supp. 1128 (S.D.N.Y.

69 Civ. 2227) decided this day, arises out of the bitter struggle between the two companies for control of Piper Aircraft Corporation. That struggle ended in the marketplace with Bangor Punta in control and continues in the complaints and cross complaints by the parties against each other arising out of their competition.[1]

The principal facts are set out in this Court's opinion in 337 F.Supp. 1128, S.D. N.Y. 69 Civ. 2227. They will be deemed incorporated and need not be repeated at length here.

Chris-Craft sued for damages as the losing contender for control of Piper by reason of Bangor Punta's alleged wrongful acts. Bangor Punta countered by charging, in essence, that because of the wrongful acts of Chris-Craft it paid more than it would otherwise have paid to acquire control of Piper. Both suits were tried together.

Bangor Punta adduced no proof specifically in its case as plaintiff. It seeks support for its contentions in the record developed in Chris-Craft v. Bangor Punta et al., 337 F.Supp. 1128 (S.D.N.Y. 69 Civ. 2227).

This complaint, like that in the companion case, is replete with charges of breach of the requirements of securities laws and rules. Like the other, it has been brought and tried as though any such breach by a competitor automatically creates windfalls for a sophisticated and well-financed contender for corporate control. It must be remembered that this is an action by the willing and winning contender which bought Piper stock with its eyes open, presumably paying what it deemed control of Piper to be worth. The Court has here been especially challenged to maintain its footing in the realities and the equities in searching (in vain) for credible evidence establishing causal connections between alleged violations and actionable damage.

## The Contentions

(a) Bangor Punta insists that the plan of Chris-Craft to acquire control of Piper existed before the time when, according to Chris-Craft, the plan was formulated and that Chris-Craft concealed its true purpose from a registration statement filed with SEC to raise capital for the purchase and from prospectuses legally required to be used during a period when its unrevealed plan to obtain control of Piper was in existence.

■ We comment here on this contention bcause it is typical of others in the case. Even if it rested on more than mere surmise, it raises no issue proper to a plaintiff in Bangor Punta's posture. Bangor Punta was not a purchaser of securities issued under the statement of which it complains. There are possible links of relevance between the alleged deficiency in the registration statement and Bangor Punta's campaign. But they are not links to liability of Chris-Craft to Bangor Punta. Thus:

(1) If the registration statement were materially misleading there might be room to argue that Chris-Craft obtained by illegal means the money used to compete with Bangor Punta. There might then be examined the rights of those from whom the money was so obtained. But the Court sees no basis for awarding damages to Bangor Punta because Chris-Craft failed to disclose to its sources of funds its intended use of those funds.

■ (2) If Chris-Craft did intend to use the proceeds of this registered issue to obtain control of Piper, a disclosure of that fact would have given Piper (and/or Bangor Punta) an earlier opportunity than they had in fact to prepare a counter-campaign. However, Chris-Craft owed no duty to Piper or Bangor Punta to announce its intentions for their benefit. Its disclosure obligations (assuming they existed as alleged) in the prospectus complained of or in 13–D reports, were for the benefit of investors with whom Chris-Craft would

---

1. Piper, the target company, asserted a counter claim against Chris-Craft in 337 F.Supp. 1128, S.D.N.Y. 69 Civ. 2227.

be dealing in its campaign for control.[1A] Bangor Punta does complain of failure to make—and of inadequate—13–D statements. Thus:

(i) It asks us to find that Chris-Craft and the broker it used to buy Piper stock constituted a "group" or "syndicate" whose intentions should have been reported.

(ii) It contends that 13–D statements made by Chris-Craft should have disclosed that (as alleged by Bangor Punta) cash used in Chris-Craft's tender offer was borrowed and that such use of the cash would constitute a default under certain of Chris-Craft's arrangements with its creditors.

The first of these contentions is not only far-fetched, but is wholly out of Bangor Punta's reach as a weapon against Chris-Craft. The latter contention would be a dubious one even if made by a Piper stockholder to whom the statement is specifically addressed. For that stockholder either tenders and walks off with cash or remains a Piper holder having no concern with Chris-Craft's relations with its creditors.[2]

(b) Bangor Punta alleges that Chris-Craft opened a "secret" "numbered" account at a brokerage firm which assisted it in locating and acquiring large institutionally held blocks of Piper. At least one institution (Technology Fund) it is claimed, to which Chris-Craft paid $65 per share for more than 100,000 shares of Piper—at a time when the market was in the low fifties—simultaneously made a large purchase of Chris-Craft stock in the open market. The alleged purpose of this allegedly pre-arranged move was to "stabilize or manipulate" the price of Chris-Craft common. Chris-Craft planned to include in its acquisition program an offer of exchange of Chris-Craft for Piper securities. Obviously, a high price for Chris-Craft common would greatly facilitate such an exchange.

(c) Several other institutions (one of which had tendered Piper stock to Chris-Craft for cash during the pendency of a Chris-Craft tender offer) also bought large amounts of Chris-Craft on the open market. In the month shortly before Chris-Craft filed its registration statement to cover its proposed exchange offer, these institutions purchased some 231,800 Chris-Craft shares (more than 17%) of the number outstanding. These purchases caused the daily average of trading on the New York Stock Exchange to increase from 7,500 shares to 23,400 shares. The price of Chris-Craft common, during this month, rose to 45% above the average of its closing prices for the six weeks preceding these purchases.

By mid-1970, with the serious market decline, notably in prices of stocks of conglomerates, the institutions were taking heavy losses. Their liquidations of position, Bangor Punta claims, were designed to do the least damage to the price of Chris-Craft and hence to the progress of Chris-Craft's exchange offer program.

(d) While its cash tender offer for Piper stock was open Chris-Craft was also buying Piper stock in the open market. This was a violation of S.E.C.'s Rule 10b–6 and the Commission, upon becoming aware of what was happening, ordered Chris-Craft to cease these purchases. Thereupon at least one institution (which had previously sold a large block of Piper to Chris-Craft) purchased Piper stock in the open market and tendered the shares to Chris-Craft. Bangor Punta claims the transaction to be a device to have done by others what Chris-Craft could not do itself.

---

**1A.** See GAF Corporation v. Milstein, 324 F.Supp. 1062 at 1070 (S.D.N.Y.1971) (Pollack, J.) "the Williams Bill concentrated on an investor protection goal rather than on providing protection for management's ability to repel raiders."

**2.** The situation is not the same, of course, in a registration statement covering an offer of exchange. There the accepting holder of target company stock is destined to become an investor in the offering company—with a strong interest in that company's relations with its creditors.

Bangor Punta bottoms its case on Rule 10b–5 under the Securities Exchange Act,[3] claiming that Chris-Craft's "integrated" bid for control of Piper was in its entirety a "manipulative and deceptive contrivance" whose total effect was to inflate the price of Piper stock and so to damage Bangor Punta as a purchaser of that stock. It cites Eagle v. Horvath, 241 F.Supp. 341, 344 (S.D.N.Y.1965) for the proposition that while a thoroughly legal campaign by Chris-Craft for control of Piper might also have raised the price of Piper stock, it must make restitution for having done the same thing by illegal means.[4] It cites other cases for the propositions that privity between buyer and seller is not an essential condition for application of Rule 10b–5, Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786 (2d Cir. 1951)[5] and that manipulative activities unrelated to the plaintiff and not designed to induce the plaintiff to buy or sell are, nonetheless, actionable. Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962); [6] Sarlie v. E. L. Bruce Co., 265 F.Supp. 371 (S.D.N.Y.1967).[7] Characterizing itself as a buyer of Piper "deceived" by the manipulative activity of Chris-Craft, Bangor Punta also invokes Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969),[8] cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

Other aspects of Chris-Craft's program are complained of—quite apart from their place in an overall scheme alleged to be unlawful.

1. The allegedly induced purchases of Chris-Craft common by institutions

---

3. 17 C.F.R. § 240.10b–5 (1971).

4. *Horvath* and apposite cases, if at all applicable here, are in an important sense contrary to Bangor Punta's position. Bangor Punta asks us to regard the entire Chris-Craft program as fatally tainted because of alleged violation spots in the program. It does not bear the burden of showing the causal relation between the violations themselves and its damage. Yet, the holding in *Horvath* is precisely that such a relation is a vital issue. In *Horvath* a motion for summary judgment in a stockholders' suit was denied because there was, at issue, the question whether an alleged false prospectus in fact motivated stockholder votes on the plan being attacked in the case.

We did not, at Chris-Craft's instance, spread the taint of single alleged violations by Bangor Punta over all of Bangor Punta's campaign. We see no warrant for a contrary treatment of Bangor Punta's contentions here.

5. In *Fischman*, the Court (Frank, C. J.) pointed out the difference in proof required to sustain a Section 11 suit under the Act of 1933 and a Section 10–b suit under the Act of 1934. In the former the plaintiff's burden is to show an acquisition of the direct subject of a registration statement while in the latter, any decived purchaser relying on a *fraud* may sue.

6. Cochran v. Channing was a suit by a holder of Agricultural Insurance Company stock who sold at depressed prices and alleged that Channing Corporation, the defendant, dominated the Company, formed an undisclosed plan to secure control of it by offering an exchange of stock of another company for Agricultural and by purchasing Agricultural stock at depressed prices caused by lowering Agricultural's dividend and other similar practices. Judge Dawson of this District held the complaint good under Rule 10b–5 against a motion to dismiss for lack of privity. The case cannot support the contentions of a plaintiff in Bangor Punta's posture. It cannot claim itself a beneficiary of any fiduciary obligation of Chris-Craft such as was deemed by Judge Dawson to be owed by Channing to the plaintiff.

7. Sarlie v. Bruce seems wholly inapposite. It involved a default dismissal of plaintiff's action and concerned itself largely with the measure of damages in a counterclaim by a company (Bruce) whose president (Gilbert) allegedly used misappropriated funds in an attempt to capture control of Celotex Corporation.

8. Crane v. Westinghouse, is beside the mark. There, the alleged market manipulation was effected for the express purpose of preventing a competitor for control from succeeding in its bid and the facts pleaded showed a distinct causal nexus between the manipulation and its actual and intended result. To suggest that Chris-Craft, itself an avid buyer of Piper, "manipulated" the price of Piper upward and to characterize Bangor Punta as a buyer "deceived" by this manipulation strains even credulity.

preceding the Chris-Craft exchange offer are alleged to be manipulations in violation of Section 9(a) (2) of the Exchange Act [9] which inflated the price of Piper common, as well as that of Chris-Craft. *Crane, supra* is cited as authority for Chris-Craft's liability.

2. Bangor Punta has reached into the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq., in its search for deficiencies in Chris-Craft's program and purports to have found one in Section 17(a), 15 U.S.C. § 80a–17(a) (1971) of that Act. The Section (together with relevant Section 2(a) (3), 15 U.S.C. § 80a–2(a) (3)) provides that without an express order of S.E.C.

> Sec. 17(a) It shall be unlawful for any affiliated person or promoter of or principal underwriter for a registered investment company (other than a company of the character described in section 80a–12(d) (3) (A) and (B) of this title), or any affiliated person of such a person, promoter, or principal underwriter, acting as principal
>
> . . .
>
> (2) knowingly to purchase from such registered company, or from any company controlled by such registered company, any security or other property (except securities of which the seller is the issuer) . . .
>
> Sec. 2(a) (3) "Affiliated person" of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; . . .

Since, at the time Chris-Craft made its purchase from Technology Fund, *supra*, both it and the Fund owned more than 5% of Piper, Chris-Craft was an affiliate of an affiliate of an investment company and prohibited from making the purchase without prior order of S.E.C. No such order was ever requested.

### The Merits of the Contentions

Chris-Craft's response to Bangor Punta's charges is to label Bangor Punta's case as "sheer fantasy" and its inferences as "Kafkaesque logic". Chris-Craft's attacks on the evidentiary underpinning and legal support of Bangor Punta's case would require a minute consideration of the record and of precedents cited were this Court to accord to Bangor Punta the status of damaged innocent which it claims for itself.

But Bangor Punta cannot wear that mantle. It was the willing and winning contestant in a hard fought and (for both sides) enormously expensive struggle for control.

This Court will readily agree that Bangor Punta paid more to acquire control of Piper than it would have if Chris-Craft had not, by the time Bangor Punta entered the contest, already been well on its way in acquiring Piper Stock. Indeed the possibilities are that, if Chris-Craft had not already shown itself to be so powerful a bidder for control, Bangor Punta's cost would have been zero. For the record is ineluctably convincing that Bangor Punta came in at Piper's urging and specifically to resist Chris-Craft.

■ In dealing with Chris-Craft v. Bangor Punta et al., *supra*, this Court made it clear that it would not, at the behest of a disappointed contender in a battle for corporate control, necessarily take the same view of the requirements of the securities laws and rules as it does in cases of claimed injury to the average public investor. These considerations apply with even greater vigor to actions by the winner complaining that he was forced to overpay.

---

9. Section 9(a) (2), 15 U.S.C. § 78i(a) (2) (1971), reads: "It shall be unlawful for any person, . . . to effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

Bangor Punta's claim of "integrated" and "concerted" efforts by "coparticipants" has no more weight than similar language aimed by Chris-Craft, as plaintiff, against Bangor Punta as defendant. Chris-Craft has amply disposed of several of Bangor Punta's factual contentions (as e. g., its charge that an originally submitted and then deleted portion of Chris-Craft's registration statement to cover its debenture issue in December 1968 "evidenced" an undisclosed intention to acquire Piper with the proceeds). But even taking on their face each of Bangor Punta's charges of violations leaves us asking why Bangor Punta should be made a money beneficiary. The price it paid for Piper it paid with open eyes. The rapport between it and the Piper management should have given it more easy access to information about Piper than was available to Chris-Craft—even with two Chris-Craft representatives on the Piper board. Its inducement to pay the prices it did for Piper control was not in any one or combination of the violations it seeks to lay at Chris-Craft's door step. The inducement was its own determination to have control.[11]

However, even if Bangor Punta were an apt plaintiff to raise the shield of the securities laws and rules for its protection, this Court would have great difficulty in finding—on facts and law—that a convincing case has been made out. Bangor Punta did not carry its burden of persuasion on the issues presented in its case against Chris-Craft. Its basic claim that Chris-Craft "manipulated" upward the price of Piper stock asks us to assume that Chris-Craft massaged the market against its own interest—since Chris-Craft was in an acquisition campaign—and that Bangor Punta, amply aware of what Chris-Craft was doing, and bidding Chris-Craft up, was somehow victimized by this massaging.[12] The claim is patently untenable. Its claim that purchases of Chris-Craft common by institutions were arranged for manipulative or evasive reasons are pure surmise—such basis as they do have is purely circumstantial and lacks the persuasive power needed to support such charges. The charge that in disposing of Chris-Craft holdings the institutions acted to produce the least possible disturbance of price does no more than charge the institutions with ordinary prudence in their management of their affairs.

■■ The charge of violation of Section 17(a) of the Investment Company Act, 15 U.S.C. § 80a–17(a) (1971) has some surface plausibility but as little substance as the others. That section can apply to the Chris-Craft-Technology Fund transaction only upon a most abstrusely technical reading. It is not clear whether the mechanics of transfer and delivery and the "as of" dates for voting of Piper stock at a forthcoming meeting were such as to truly vest in Chris-Craft voting power for its 5% plus holding in Piper at the time. Even if it did have that power, the record before this Court is convincing that Chris-Craft, did not then or thereafter, exercise any controlling influence in Piper.

11. The disposition of this case and of Chris-Craft v. Bangor Punta et al., 337 F. Supp. 1128, S.D.N.Y. 69 Civ. 2227 eliminates any requirement for findings as to damages. Were such findings necessary, this Court could give no weight to the unsubstantiated and cursory evidence presented on behalf of Chris-Craft. On the other hand, the careful and well-documented analysis presented by the expert for Bangor Punta was persuasive in the main on the issue of fair market value of Piper stock in or about May, 1969 during, but uninfluenced by, the contest for control and fair market value uninfluenced by extraneous factors at the time of the trial herein in March, 1971.

12. The willingness of an innocent buyer to pay a manipulated price does not deprive him of a right to complain of the manipulation. But the essence of a manipulation is the execution of transactions affecting prices or actual or apparent market activity for the purpose of inducing others to buy or sell. While Chris-Craft's initial and subsequent bids raised the prices of Piper stock these bids were for the *bona fide* purpose of acquiring stock for itself, not to induce others to buy the stock.

Section 17(a) was designed to protect an investment company in its transactions with affiliates. In view of the price received by the Technology Fund ($65 per share as against the then market in the low fifties) and of subsequent events, it is difficult to discern any harm to the Fund in its sale of Piper stock to Chris-Craft. Bangor Punta is, under the circumstances, well beyond the pale of protection fairly intended by Section 17(a) of the Investment Company Act.

■ Bangor Punta's charges, compiled by able and diligent counsel, are an illuminating catalogue of pitfalls in the path of a contender for control of an unwilling target, competing with a well-financed adversary. However, the diligence is misplaced. The alleged breaches must not only be supported by credible evidence but must, importantly, be causally linked to damages. The complaint falls short on both scores.

The complaint is dismissed for failure to sustain with credible evidence, the burden of proof cast upon the plaintiff.

The foregoing shall constitute the findings and conclusions required by F. R.Civ.P. 52(a).

So ordered.