**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Gordon W. CURRY, Jr., Defendant-Appellant.**

No. 81–3130.

United States Court of Appeals, Fifth Circuit.

July 29, 1982.

Rehearing Denied Sept. 23, 1982.

Steve M. Marks, Baton Rouge, La., for defendant-appellant.

C. Michael Hill, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

Gordon Curry appeals his conviction on three counts of mail fraud,[1] arguing that there was no jurisdiction under the mail fraud statute, that the evidence was insufficient to support a guilty verdict, and that the trial court erred in refusing to instruct the jury that good faith was a defense to the violations charged. While we find that the evidence was indeed sufficient to support the convictions for mail fraud, we conclude that the trial court erred in refusing to provide the requested jury charge. Accordingly, we reverse.

## FACTS

Gordon Curry's indictment and conviction for mail fraud arise out of his activities as chairman of a citizens' political action organization during three elections in 1978 and 1979. The defendant is accused of fraudulently converting to his own use thousands of dollars received by him from electoral candidates on behalf of his political organization. In addition, the defendant is said to have mailed false documents to a state election supervisory committee in an effort to both conceal his fraudulent conversion of funds and to deny the state of Louisiana true and correct information concerning campaign finances.

Gordon Curry was chairman of the political action committee of an organization incorporated under Louisiana law as P.E.O.P. L.E., Inc. "P.E.O.P.L.E." was a group of black citizens in the South Baton Rouge area who performed various social, civil, charitable and political functions.[2] In early 1978, a group of P.E.O.P.L.E. members formed a so-called "political action committee," ostensibly for the purpose of support-

---

1. 18 U.S.C. § 1341.

2. P.E.O.P.L.E. stands for People Encouraging Other People Living Everywhere. The organization's brochure states:

 "P.E.O.P.L.E., Inc. is a community-based organization of concerned citizens established in November 1976. We came together to upgrade the social, economic and political conditions in East Baton Rouge Parish by coordinating people-oriented programs—particularly those providing services to youth and the elderly. As we seek to achieve these goals, we strongly encourage voter registration and education to promote an enlightened sense of civil responsibility among our citizens."

ing political candidates chosen by the organization. Actually, candidates paid P.E. O.P.L.E. large amounts for its official endorsement, and for providing an array of campaign assistance services such as distributing signs and bumper stickers, printing ballots, and calling voters. P.E.O.P.L.E.'s presidents testified that any funds received from candidates over and above the cost of these election services were to be turned over to P.E.O.P.L.E.'s treasury and used to support programs to benefit youth and the elderly. Thus, P.E.O.P.L.E.'s "political action committee," served both to support the organization's political goals, and as a fundraising vehicle for the organization's other programs.

Gordon Curry was chairman of P.E.O.P.L.E.'s political action committee during three elections in 1978 and 1979. P.E.O.P.L.E. supported eight candidates in the September, 1978 election; six candidates in the November, 1978 election; and two candidates in the April, 1979 election. Candidates endorsed by P.E.O.P.L.E. ran for various offices, ranging from the United States Senate to local school board. In his role as chairman of P.E.O.P.L.E.'s political action committee, Mr. Curry negotiated with, and received funds in cash and check directly from, candidates. In addition, Curry oversaw and managed P.E.O.P.L.E.'s campaign support activities. Candidates testified that P.E.O.P.L.E. workers, led by Curry, provided substantial campaign assistance: they placed signs in voters' yards, distributed bumper stickers and ballots, manned the polls and set up phone banks for contacting voters.

The Government contends that Gordon Curry used his position as Chairman of P.E. O.P.L.E.'s political action committee to defraud that organization of over fourteen thousand dollars. According to the Government's calculations, Curry received an aggregate of $23,777.80 on behalf of P.E.O. P.L.E. during the three elections in ques-

tion, and converted $14,975.00 of this to his own personal use. Curry deposited checks from candidates into his own checking account, or cashed the checks. According to the Government, only a small fraction of these funds were ever used to pay for campaign expenses. Instead of turning the balance of funds over to P.E.O.P.L.E., as he was required to do, Curry allegedly used the money for his own personal expenses.

Louisiana's Election Campaign Finance Disclosure Act (hereinafter "the Election Act")[3] requires political committees to report their campaign finances to a Supervisory Committee. Pursuant to the Election Act, Mr. Curry mailed[4] affidavits attesting to P.E.O.P.L.E.'s campaign finances to the state's Supervisory Committee after each election. The Government contends that the affidavits mailed by Curry to the Supervisory Committee were false and fraudulent under the terms of Louisiana's Election Act. According to the Government, the false affidavits were intended by Curry to conceal from the Committee and from P.E.O.P.L. E.'s membership the true amounts of money received by Curry on P.E.O.P.L.E.'s behalf from political candidates, thereby preventing detection of Curry's scheme to defraud P.E.O.P.L.E.

## PROCEEDINGS BELOW

Curry was indicted on three counts[5] of violating the mail fraud statute, 18 U.S.C. § 1341. Defendant filed several pre-trial motions, including a motion to dismiss the indictment for lack of jurisdiction, which were denied. At the close of trial, defendant submitted a request for a "good faith" jury charge, which was also denied. The jury found Curry guilty of all three counts of mail fraud. The district court denied defendant's post-trial motions for judgment of acquittal, based on insufficiency of evidence; and for arrest of judgment, based

---

**3.** La.R.S. 18:1481 *et seq.*

**4.** The defendant stipulated that he mailed, or caused to be mailed, each of the three affidavits described in the indictment.

**5.** Under the mail fraud statute, each mailing is a separate violation.

on lack of jurisdiction. Defendant brought this appeal.[6]

## ISSUES ON APPEAL

Three principal questions are presented on appeal.[7] First, assuming arguendo the existence of a scheme to defraud P.E.O.P. L.E., we must determine whether there is sufficient connection between the fraudulent scheme and the affidavits mailed by Curry to constitute the federal crime of mail fraud. Second, we must examine the record to determine whether there is sufficient evidence to sustain a guilty verdict. Finally, we must decide whether the district court erred in refusing to charge the jury on the issue of defendant's good faith.

## THE CRIME OF MAIL FRAUD

■ The mail fraud statute prohibits in general terms the use of the United States mails in furtherance of fraudulent schemes.[8] Thus, in order to establish mail fraud, the Government must prove both the existence of a scheme to defraud, and use of the mails "for the purpose of executing" that scheme. *U. S. v. Goss,* 650 F.2d 1336, 1341 (5th Cir. 1981); *U. S. v. Freeman,* 619 F.2d 1112, 1117 (5th Cir. 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *U. S. v. Kent,* 608 F.2d 542, 545 (5th Cir. 1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1981); *U. S. v. Zicree,* 605 F.2d 1381, 1384 (5th Cir. 1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Specific intent to defraud is an essential element of the crime. *U. S. v. Goss, supra; U. S. v. Freeman,*

*supra; U. S. v. Kent, supra* at 545 n.3. *See generally* K. Carlyle, *A Survey of the Mail Fraud Act,* 8 Memphis State L.Rev. 673, 677–678 (1978) (discussing the intent requirement in mail fraud cases). Accordingly, the defendant's good faith is a defense to charges of mail fraud. *U. S. v. Goss, supra.*

■ The definition of a scheme to defraud is quite broad. As a learned judge of this Circuit[9] once remarked in regard to the mail fraud statute, "[t]he law does not define fraud; it needs no definition; it is as old as falsehood and as versatile as human ingenuity." The language of the mail fraud statute is sufficiently flexible to encompass any conduct "which fails to match the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Blackly v. U. S.,* 380 F.2d 665, 671 (5th Cir. 1967).

■ Moreover, a scheme to defraud need not necessarily contemplate loss of money or property to the victims. *See, e.g., U. S. v. Isaacs,* 493 F.2d 1124, 1149–50 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *United States v. States,* 488 F.2d 761, 764 (8th Cir. 1973); *U. S. v. Mandel,* 415 F.Supp. 997, 1011 (D.Md. 1976), *aff'd in relevant part,* 591 F.2d 1347 (4th Cir. 1979), *aff'd in relevant part,* 602 F.2d 653 (4th Cir. 1979) (en banc), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). Although the Government must prove that some actual harm was contemplated by the defendant, *U. S. v. Regent Office Supply,* 421 F.2d 1174, 1180

---

**6.** Jurisdiction is based on 28 U.S.C. § 1291.

**7.** In addition to the issues discussed herein, the appellant suggests that the trial court erred in refusing his request for a Bill of Particulars, in refusing to exclude certain jurors, and in certain of its evidentiary rulings. We have considered each of these arguments, and find them to be without merit.

**8.** 18 U.S.C. § 1341 reads in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**9.** Judge Holmes, in *Weiss v. U. S.,* 122 F.2d 675, 681 (5th Cir.), *cert. denied,* 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941).

(2d Cir. 1970), it is well-established that a scheme which operates to deprive citizens of "intangible rights or interests" is a scheme to defraud under section 1341. *U. S. v. McNeive,* 536 F.2d 1245, 1248–49 (8th Cir. 1976). Thus, the mail fraud statute has been interpreted to forbid the use of the mails for schemes to defraud citizens of an elected official's honest and faithful services, *see U. S. v. Isaacs, supra; U. S. v. Mandel, supra* ; of political and civil rights, *see, U. S. v. States, supra* ; and of information relevant to public officials' duties, *see, U. S. v. Mandel,* 591 F.2d at 1364. *See generally,* K. Carlyle, *supra* at 679–680 (discussing schemes to defraud aimed at "intangible" rights).

■ The indictment in this case describes two separate and distinct fraudulent schemes allegedly perpetrated by Curry, each scheme involving a different set of purported victims. First, it is alleged that Curry devised a scheme to defraud P.E.O.P. L.E. of funds collected from political candidates by converting these funds to his own use. This scheme also involved defrauding P.E.O.P.L.E.'s membership of their right to Curry's honest, true and faithful services as chairman of the political action committee. Second, Curry is alleged to have defrauded the Supervisory Committee of its right to obtain true and correct financial disclosure reports as required by the Election Act.[10]

We find that the conduct described in the indictment, if supported by the evidence, would constitute two separate schemes to defraud within the context of the mail fraud statute.[11] The more difficult question is whether the affidavits mailed by Curry could have been "for the purpose of executing" his scheme to defraud P.E.O.P. L.E.[12]

■■ Since the mail fraud statute was enacted, courts have been plagued by difficulties in defining the necessary degree of connection between a mailing and a scheme to defraud.[13] A number of "tests" have been formulated. Thus: "[i]t is not necessary that the scheme contemplate the use of the mails as an essential element;" it is necessary only that the mailing be "incident to an essential part of the scheme." *Pereira v. U. S.,* 347 U.S. 1, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954); and "[t]he requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mail." *U. S. v. Kent,* 608 F.2d at 546. A document mailed after the completion of a scheme to defraud may still be "for the purpose of executing" the scheme if the mailing was intended to conceal the fraud from the victim and "therefore make the

---

**10.** The indictment alleges in addition that Curry defrauded the citizens of East Baton Rouge Parish of their right "to be fully informed of the financial activities and relationships of political committees and candidates for public office." We see this allegation as part of, and subsidiary to, the alleged scheme to defraud the Supervisory Committee out of true and correct information, which would in turn have been made available to all citizens in Louisiana.

**11.** The same conduct could also give rise to charges of state law violations. Thus, Curry faced the possibility of being indicted under Louisiana law, for, *inter alia,* embezzling, and for "knowingly and willfully" filing a false campaign report in violation of the Election Act's criminal provisions. *See* R.S. 18:1491. However, "[t]he fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute. . . ." *Parr v. U. S.,* 363 U.S. 370, 80 S.Ct. 1171, 1183, 4 L.Ed.2d 1277 (1960), *citing Badders v. U. S.,* 240 U.S. 391, 36 S.Ct. 367, 368, 60

L.Ed. 706 (1915). Thus even when a state is itself the victim of a fraudulent scheme, and makes the scheme illegal under state law, the perpetrators may still be prosecuted under the federal mail fraud statute. *U. S. v. Flaxman,* 495 F.2d 344, 349 (7th Cir. 1974). Of course, conviction under state law would be for the underlying fraud, and not for use of the United States mails in furtherance of the fraud.

**12.** With regard to the alleged scheme to defraud the Supervisory Committee of true and correct information, there can be no question that the affidavits were mailed to the Committee "for the purpose of executing" such a scheme.

**13.** *See generally* J. S. Rakoff, *The Federal Mail Fraud Statute (Part I),* 18 Duquesne L.Rev. 771–823 (1980) (discussing the history and peculiarities of the mail fraud statute and cases arising thereunder).

apprehension of the defendants less likely than if no mailings had taken place." *U. S. v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974).

The mailings in this case consist of three affidavits sent to the Supervisory Committee charged with enforcing Louisiana's Election Act. The Government contends that the affidavits were "incidental to an essential element" of Curry's scheme to defraud P.E.O.P.L.E. in several respects. First, since all political committees are required by law to report to the Supervisory Committee, the affidavits were a necessary part of P.E.O.P.L.E.'s continued existence as a political committee, and thus, of Curry's scheme to use that organization to obtain funds for himself. In other words, the affidavits were the *sine qua non* of P.E.O.P.L.E.'s continued political operations, and hence, of Curry's fraudulent scheme. Under this theory, the truth or falsehood of the affidavits is irrelevant: even if the affidavits were themselves true and correct, Curry would still be guilty of mail fraud because his scheme to defraud P.E.O.P.L.E. was "dependent in some way," *U. S. v. Kent, supra,* on the documents mailed.

■■■ We find that this connection between the affidavits mailed by Curry and his scheme to defraud P.E.O.P.L.E. is, by itself, insufficient to establish a violation of the mail fraud statute. It is true that, ordinarily, the mailing of documents which are themselves innocent may still constitute the crime of mail fraud if the documents are mailed in execution of a scheme to defraud. *Parr v. U. S.*, 363 U.S. 370, 80 S.Ct. 1171, 1183, 4 L.Ed.2d 1277 (1960); *U. S. v. Caldwell*, 544 F.2d 691, 696 (4th Cir. 1976); *U. S. v. Reid*, 533 F.2d 1255, 1265 (D.C.Cir.1976). However, mailings of documents which are required by law to be mailed, and which are not themselves false and fraudulent, cannot be regarded as mailed for the purpose of executing a fraudulent scheme. *Parr v. U. S.*, 80 S.Ct. at 1183.[14]

The affidavits in this case were mailed by defendant pursuant to the requirements of Louisiana's Election Act. Under these circumstances, *Parr* rules our jurisprudence. Thus, if the affidavits were true and correct, as Curry contends, the affidavits cannot, under the holding of *Parr*, be regarded as mailed for the purpose of executing Curry's scheme to convert P.E.O.P.L.E.'s funds to his own use.

■■■ In order to establish a violation of the mail fraud statute in this case, which involves documents mailed pursuant to state law, the Government must prove something more than the mere mailing of the affidavits. If the Government proves that the affidavits were themselves false, and were intended by Curry to defraud Louisiana's Supervisory Committee of true and correct campaign finance information, Curry's conviction under the mail fraud statute would be sustained. *See U. S. v. Isaacs*, 493 F.2d at 1149–50; *U. S. v. States*, 488 F.2d at 764; *U. S. v. Mandel*, 415 F.Supp. at 1011. Alternatively, Curry's conviction would be sustained if the Government proved that the affidavits were false, and that Curry mailed the false affidavits in a deliberate attempt to prevent discovery of his scheme to defraud P.E.O.P.L.E. *See U. S. v. Maze*, 94 S.Ct. at 650. Under either theory, however, Curry's good faith belief that the affidavits were in compliance with Louisiana's Election Act would be relevant to the issue whether the affidavits were mailed for the purpose of executing a scheme to defraud. *See U. S. v. Goss*, 650 F.2d at 1341.

---

**14.** In *Parr*, defendants, members of the Benavides Independent School District, were engaged in an on-going scheme to defraud the District's taxpayers by embezzling tax revenues. Pursuant to state law, defendants mailed tax assessments, which were not proven to be themselves illegal, to taxpayers in the District. Defendants then illegally appropriated a large portion of these tax revenues for their own use. The Supreme Court stated:

> "we think it cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the mail fraud statute, even though some of those who are required to do the mailing for the District plan to steal, when or after received some indefinite part of its moneys."

*Parr v. U. S.*, 80 S.Ct. at 1183–84.

■ Thus, we must examine the record to determine first, whether there was sufficient evidence of schemes to defraud the Supervisory Committee or P.E.O.P.L.E.; second, whether there was sufficient evidence that the affidavits were mailed in furtherance of the fraudulent schemes; and third, whether the jury was properly instructed as to the relevancy of Curry's good faith, if any. Throughout our analysis, we will use two standards to evaluate the quality and quantity of evidence. In order to determine if the evidence was sufficient to sustain Curry's conviction, we must evaluate the evidence in the light most favorable to the Government. *Glasser v. U. S.*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *U. S. v. Goss*, 650 F.2d at 1341. In deciding whether Curry was entitled to a good faith jury charge, however, we need only search for *any* evidence of good faith. This is because "if there is any evidentiary support whatsoever for a legal defense, and the trial court's attention is specifically directed to that defense, the trial judge commits reversible error by refusing thus to charge the jury." *U. S. v. Goss*, 650 F.2d at 1344, n.7. Thus equipped with a legal road map and compass, we set off to explore the dense thicket of evidence and argument which comprises this appeal.

## SUFFICIENCY OF THE EVIDENCE

### A. *Evidence of a Scheme to Defraud*

■ The record is replete with evidence that Gordon Curry abused his position of trust as chairman of P.E.O.P.L.E.'s political action committee by diverting funds earmarked for P.E.O.P.L.E. to his own use. Candidates testified that Mr. Curry asked them for sums of money, describing these sums as the candidates' *pro rata* share of election expenses. (Candidates who refused to pay were not endorsed.) The money was given to Curry in several ways. Candidates testified that on many occasions, Curry asked for, and received, funds in cash. On other occasions, checks were written out to "P.E.O.P.L.E., Inc." These checks were endorsed by P.E.O.P.L.E.'s current president, Mr. Ford or Mr. Johnson, and by Mr. Curry, and then deposited in Mr. Curry's personal bank account, or cashed by Mr. Curry. After P.E.O.P.L.E. had its own bank account, Mr. Curry deposited checks from candidates in that account. He would then request of P.E.O.P.L.E.'s treasurer that she write a check on P.E.O.P.L.E.'s account to Mr. Curry for the amount deposited. These checks were deposited in Mr. Curry's personal account.

It is true that Mr. Curry used his personal account for receipt of candidate's funds with the knowledge of P.E.O.P.L.E.'s President during periods in which P.E.O.P.L.E. did not have its own account. However, both Mr. Ford and Mr. Johnson testified that Curry was supposed to use the money received from candidates for campaign expenses, and that any excess funds were to be turned over to P.E.O.P.L.E.'s treasury. These funds were to be used for P.E.O.P.L.E.'s programs to assist youth and the elderly.

The bulk of campaign expenses incurred by P.E.O.P.L.E. were for salaries to workers [15] who put up signs, distributed information, and served as poll watchers. However, the evidence shows that P.E.O.P.L.E. workers were not paid out of funds deposited in Curry's account.[16] Rather, they were paid by yet other checks demanded by Curry from candidates. Candidates were instructed to write large numbers of checks for small amounts with the payees' names left blank. These checks were then distributed by Curry to poll workers.

Thus, after elections, Curry was left with thousands of dollars collected from candi-

15. Candidates testified that they themselves provided the signs, bumper stickers, and other campaign materials for distribution.

16. Mr. Hahn, an FBI agent with expertise in financial records, examined all of the checks written on Mr. Curry's personal accounts from 1978 to 1979. Of these, he identified only $479.63 which could be characterized as payments for campaign expenditures. Mr. Hahn also identified $628.00 as cashed checks, who's purpose was unknown. The remaining checks were made out for personal living expenses.

dates in his personal bank account; money which was not used to pay P.E.O.P.L.E. workers, or for any other campaign expenses. Yet both Mr. Ford and Mr. Johnson testified that none of this money was ever turned over to P.E.O.P.L.E. Instead, Mr. Curry reported to them that P.E.O.P.L.E. suffered from a *shortage* of funds after elections.

In sum, the evidence shows clearly that Curry used his position as chairman of P.E.O.P.L.E.'s political action committee to solicit thousands of dollars from candidates for election expenses. It shows also that instead of disbursing the money either for election expenses or to P.E.O.P.L.E.'s treasury, Mr. Curry converted the money to his own use. Moreover, in light of the testimony of P.E.O.P.L.E.'s presidents, it is not reasonable to assume that Mr. Curry believed he was authorized to use the candidates' money to compensate himself for campaign work. Both Mr. Ford and Mr. Johnson testified that Mr. Curry was not entitled to receive a salary for his activities as chairman of the political committee. Even if, as Mr. Curry contends, he was entitled to compensation for his campaign efforts, he could not have been entitled to the amounts involved here. According to the Government's analysis, which is supported by the evidence, Curry took for his own use approximately $14,975.00 of funds received from candidates. This figure far exceeds amounts paid to other P.E.O.P.L.E. members for campaign work,[17] and cannot be construed as reasonable compensation for even the most prodigous of election efforts.

Thus, a jury could reasonably conclude that Gordon Curry intentionally used his position as chairman of P.E.O.P.L.E.'s political action committee to defraud that organization of thousands of dollars solicited by Curry from candidates endorsed by P.E.O.P.L.E. Certainly, there is sufficient evidence to show that Curry's conduct did not comport with our society's concepts of "fair play and right dealing," *Blackly v. U. S., supra,* and thus constitutes a "scheme to defraud" as that term is used in the mail fraud statute.

**B. Evidence of Mailing in Execution of a Fraudulent Scheme**

We turn now to the more complicated question of whether there was sufficient evidence to sustain a finding that defendant mailed the three affidavits described in the indictment in a deliberate effort to conceal his scheme to defraud P.E.O.P.L.E.; or in execution of a scheme to defraud Louisiana's Supervisory Committee of true and correct campaign finance information.

A brief excursion into Louisiana state law is necessary to understand the evidence. Under Louisiana's Election Act, political committees such as P.E.O.P.L.E.[18] are required to report their campaign finances to the Supervisory Committee. Ordinarily, political committees must submit a detailed report which contains the name of each person who contributed money to the political committee and the amount contributed by that person, as well as the total sum of all contributions received by the committee. R.S. 18:1486E(1) and (2). However, there is an exception for "small campaigns." R.S. 18:1487. In lieu of a full report, a political committee may file an affidavit stating first, that the committee did not receive contributions from any one source in excess of the applicable reporting amount, in this case five hundred dollars;[19] and second, that the committee's total expenditures did not exceed $5,000.

---

**17.** For instance, a list provided by Mr. Curry himself shows that six P.E.O.P.L.E. members were paid amounts ranging from $1,000.00 to $800.00 for work in the 1979 election. (As usual, the money was paid to them directly by one of the candidates in that election, and not out of funds received by Mr. Curry from the candidate.)

**18.** Defendant does not contend that P.E.O.P.L.E. is not a "political committee" as that term is defined under the Election Act, R.S. 18:1482(2).

**19.** Defendant has stipulated that $500 was the reporting amount applicable to all candidates in each of the elections.

Gordon Curry mailed an affidavit after each election stating that P.E.O.P.L.E. had not received contributions from any one candidate in excess of five hundred dollars. However, the Election Act defines "contributions" broadly as any money received for the purpose of supporting a person's election to public office.[20] Under the terms of the statute, "contributions" could include money given by a candidate to a political committee to support the candidates *own* election.

The Government argues that the affidavits mailed by Curry were patently false, since P.E.O.P.L.E. received far in excess of five hundred dollars from individual candidates in each of the three elections.[21] Moreover, a jury could reasonably conclude that the false affidavits were mailed in a deliberate effort to conceal Curry's fraudulent scheme from P.E.O.P.L.E. members. If Curry had submitted nothing to the Supervisory Committee, P.E.O.P.L.E. could have been prosecuted under the Election Act for failure to disclose campaign finances. If Curry had filed a correct report, detailing the amounts of money received from each candidate, he would have run the risk of investigation by P.E.O.P.L.E.'s members, and the possible detection of his fraudulent scheme to keep candidate's money for his own use.

Curry contends, however, that even assuming the existence of a scheme to defraud P.E.O.P.L.E., there is insufficient evidence to sustain a finding that the affidavits were mailed in an effort to conceal the scheme.

According to Curry, the affidavits were mailed directly to the Supervisory Committee; they were never distributed to any members of P.E.O.P.L.E., and therefore could not have been used as a device to misrepresent anything to that organization. Although two of the affidavits were presented by Curry to the presidents of P.E.O.P.L.E. for their signatures,[22] both Mr. Ford and Mr. Johnson testified that they did not read the affidavit carefully at the time they signed the documents. No other members of P.E.O.P.L.E. saw the affidavits.[23]

We find there is sufficient evidence to support a jury finding that Curry intended the affidavits to conceal his fraudulent scheme. First, a member of the Supervisory Committee testified that reports filed with the Committee became part of the public record, and that local newspapers frequently published campaign finance reports of particular interest. Thus, Curry risked publication of a detailed report of money received by P.E.O.P.L.E., had he filed such a report. In addition, Curry

---

**20.** The Election Act states:

(3) "Contribution", except as otherwise provided in this Part, means a gift, loan, advance, or deposit of money, or a promissory note or written contract to make a gift, loan, advance, or deposit of money made for the purpose of supporting, opposing or otherwise influencing the nomination or election of a person to public office.
R.S. 18:1482.

**21.** The Government's analysis, which is supported by the evidence, shows that P.E.O.P.L.E. received $10,650.00 from eight candidates in the first election, $7,850.00 from six candidates in the second election, and $5,052.80 from two candidates in the third election.

**22.** Mr. Alton Ford was president of P.E.O.P.L.E. in early 1978, and signed the affidavit pertaining to the first election. Mr. Johnson became president in late 1978, and signed the second affidavit. The third affidavit was signed by Gordon Curry.

**23.** Curry also argues, in a somewhat twisted fashion, that the affidavits could not have been intended to mislead Ford and Johnson because the affidavits were so patently false. The record shows that both Ford and Johnson endorsed checks made out to P.E.O.P.L.E. from candidates in amounts exceeding five hundred dollars. Thus, claims Curry, they would immediately spot the falsehood of an affidavit attesting to the fact that no more than five hundred dollars had been received by P.E.O.P.L.E. by any one candidate.

The weakness of this argument is immediately apparent: neither Ford nor Johnson in fact noticed the discrepancy in the affidavit. This is because the affidavit does not mention a dollar amount. Instead, it states, "the committee did not receive a contribution in excess of the reporting amount applicable to such candidate [or] political committee ..." The "reporting amount" is defined in the Election Act, but does not appear on the affidavit.

could not be assured of obtaining Ford's and Johnson's signatures on a detailed campaign finance report without risking investigation. The jury could have reasoned that Ford and Johnson each signed a short affidavit without questioning Curry as to its contents because nothing on the face of the affidavit aroused suspicion.[24] However, had Curry presented to the president a long report showing the total amount of funds received by him from candidates, sums which totalled $10,650.00, $7,850.00 and $5,052.80 for the three elections in question, the president might well have demanded an explanation of Curry as to the disbursement of those funds. Certainly, neither Ford nor Johnson would have been likely to accept Curry's representation that P.E.O.P.L.E. was left with a *shortage* of funds after each election.

In sum, there was ample evidence to sustain a jury finding that Curry mailed the affidavits in a deliberate attempt to conceal his fraudulent scheme from P.E.O.P.L.E.'s members; and thus, that the affidavits were mailed for the purpose of executing Curry's fraudulent scheme. Moreover, the same evidence supports a finding that Curry falsified the affidavits in order to conceal from the Supervisory Committee the true amounts collected from candidates. Thus, the jury could find that Curry intended to defraud the Supervisory Committee of correct campaign finance information.

### C. *Evidence of Good Faith*

 Having concluded that the evidence was sufficient to sustain Curry's conviction on mail fraud charges, we turn now to the question whether there was any evidence to support a good faith jury charge. As noted *supra*, good faith is a defense to charges of mail fraud. Hence, if Gordon Curry believed in good faith that the affi-

davits were correct, and were in compliance with Louisiana's Election Act, a jury could not reasonably conclude that the affidavits were intended to defraud the Supervisory Committee of true and correct campaign finance information. In addition, Curry's good faith belief that the affidavits were correct is relevant to the issue whether the affidavits were mailed by defendant in an effort to conceal his scheme to defraud P.E. O.P.L.E. Because good faith was an available defense, Curry was entitled to a good faith jury instruction if there was any evidence at all to support the charge, "regardless of how weak, inconsistent or dubious the evidence of good faith may have been." *U. S. v. Goss*, 650 F.2d at 1345.

On this record, we cannot say there was no evidence to support a finding that Curry prepared the affidavits in a good faith belief that they were true and correct.[25] The most obvious evidence supporting a finding of good faith is the ambiguity of Louisiana's Election Act. The Act defines "a contribution" as "a gift, loan, advance, or deposit of money ... made for the purpose of supporting, opposing or otherwise influencing the nomination or election of a person to public office." *See* Note 18, *supra*. The Act also requires that any "contributions" received by a political committee must be reported. However, a jury could well decide that Gordon Curry did not, in good faith, regard the money he solicited and received from political candidates as "contributions." In ordinary parlance, a political contribution is understood as a donation, voluntarily given[26] by a citizen to a candidate, in order to assist in the candidate's election efforts. Ordinarily, one expects no more in return for his money than that the candidate of his choice is elected.

---

**24.** The affidavits were introduced into evidence for the jury to examine.

**25.** The Government takes the position that there can be no finding of good faith in this case because defendant Curry did not take the stand to testify that he subjectively believed the affidavits to be true. We reject this argument. Good faith, just like bad faith, can be

proved by circumstantial evidence. To hold otherwise would effectively eviscerate the accused's right not to testify in any criminal matter in which good faith was at issue.

**26.** According to the dictionary, a "contribution" is "a sum or thing voluntarily contributed." *Webster's Third International Dictionary*.

In this case, candidates testified that they transferred funds to P.E.O.P.L.E. in exchange for a definite set of services: P.E.O.P.L.E.'s endorsement, and its workers' campaigning efforts. As far as the candidates were concerned, they were simply expending funds for necessary services.[27] Accordingly, candidates listed amounts given to P.E.O.P.L.E. as "expenditures" on their campaign finance reports. Thus, the money was seen as no more a "contribution" to P.E.O.P.L.E. than a candidate's payment for posters would be a "contribution" to a printing shop. And in fact, candidates repeatedly testified that they had specifically refused to authorize P.E.O.P.L.E. members to solicit "contributions," meaning donations from citizens, on the candidates' behalf.

The Government's position is that funds given to P.E.O.P.L.E. were "expenditures" to the candidates and at the same time, "contributions" to P.E.O.P.L.E. This interpretation of the Election Act may well be legally correct. Gordon Curry, however, is not a lawyer. The issue is whether a non-lawyer might reasonably have believed that money received in exchange for services was not a "contribution." In regard to this question, there is evidence that leaders of other political committees also thought that funds received from candidates in exchange for services did not have to be reported as "contributions."[28]

In sum, the record reveals sufficient circumstantial evidence to justify a good faith jury charge. The trial judge read to the jury the relevant portions of Louisiana's Election Act. He did not however, instruct the jury that even if the funds from candidates were "contributions," the jury should still consider whether Gordon Curry believed in good faith that the affidavits were correct, in reaching their decision on the question whether the affidavits were mailed for the purpose of concealing Curry's scheme to defraud P.E.O.P.L.E. Nor did the trial judge instruct the jury that Curry's good faith belief in the veracity of the affidavits was a defense to charges that he intended to defraud the Supervisory Committee of true and correct campaign finance information.[29] Because there was evidence to support a good faith defense, it was reversible error to not include the instructions in the jury charge.

## CONCLUSION

We have found that there was sufficient evidence to uphold a conviction for mail fraud. The record reveals a gross misuse of funds for personal gain on the part of defendant. The record also reveals evidence which could convince a jury that defendant mailed false campaign finance reports to the State of Louisiana in order to conceal

---

**27.** Indicative of the confusions surrounding the Election Act's definition of "contribution" is one candidate's response to questions on cross examination. The candidate had given money to P.E.O.P.L.E. in exchange of campaign services, and reported the amounts disbursed as "expenditures."

"Q [D]id it come to your attention that you might report these [funds] as contributions to any place?

A It was never a consideration to report it as contributions.... I couldn't even afford to run my own race, much less contribute to someone else's benefit."

**28.** Mr. Sam Livor, president of another South Baton Rouge political committee, also filled out affidavits stating that his group had not received "contributions" in excess of the reporting amount. In fact, candidates had given money to Mr. Livor's group in exchange for the same type of services as provided by P.E.O.P.L.E., and these amounts exceeded the reporting

amounts. Mr. Livors testified that he signed the affidavits because he did not think he had received any "contributions" from candidates.

**29.** In his instructions to the jury, the trial judge did comment on the Election Act in the following terms:

"In all candor, ladies and gentlemen, I must tell you that this Louisiana Campaign Finance Disclosure Act is one of the most poorly drafted statutes that in twenty-nine years at the bar I have ever seen. There are many unclear and ambiguous provisions of this statute. Let me hasten to add, however, that you are entirely free to disregard the opinion which I have just stated."

In the context of the charge as a whole, however, this comment does not adequately instruct the jury on the relationship between Curry's good faith, if any, and the charges contained in the indictment.

his misuse of funds and to deprive the citizens of Louisiana of accurate campaign finance information. However, we find that there was also some evidence to support the defendant's good faith defense, and that the trial court erred in refusing to instruct the jury as to this defense. Therefore, this case must be remanded for a new trial in order to give the proper good faith instruction. Needless to say, our decision today does not exculpate the defendant; instead, it provides a roadmap for retrial.

REVERSED and REMANDED.

GARWOOD, Circuit Judge, concurring:

I concur in the reversal and remand. I likewise concur in the holdings that there is sufficient evidence that Curry violated 18 U.S.C. § 1341 by mailing false documents to the Louisiana election Supervisory Committee [the Committee] in an effort to conceal his scheme to defraud P.E.O.P.L.E. of its funds, that in order to convict it was necessary to find the documents were false and Curry knew it, that the trial court erred by denying Curry's request for an instruction on the defense of "good faith," and that Curry's contentions referenced in note 7 of the majority opinion are without merit. Further, I join in, and agree with, all portions of the majority opinion which concern the above holdings.

I write separately solely to express my disagreement with the holding in the majority opinion that Curry would have violated 18 U.S.C. § 1341 by mailing the statements he knew to be false to the Committee, even in the absence of any proof that Curry, P.E.O.P.L.E. or anyone else was guilty of any independent actual or attempted wrongdoing which might be furthered or concealed by such falsity, merely because the false reports deprived the Committee of the true information.

As I understand it, there is no contention that either P.E.O.P.L.E. or any of the "contributing" candidates violated any law or defrauded anyone. Yet the majority holds that even if Curry had been guilty of no wrongdoing respecting P.E.O.P.L.E., he nevertheless would have violated section 1341 by mailing to the Committee reports he knew to be false. This holding is made despite the fact that in such situation the false reports would not have been intended or calculated to cause either (i) the Committee (or any part of the Louisiana government) to act differently than it would have if true reports had been filed or to be deprived of any thing or benefit whatever, other than simply the economically worthless information, or (ii) any other party, including Curry, to either receive or be deprived of any tangible thing or any actual or potential economic benefit.

I am aware of no decisions of the Supreme Court or of this Court which have extended section 1341 to situations where the scheme did not contemplate the perpetrator's acquisition or the victim's deprivation of either something tangible or some actual or potential economic benefit.[1] Decisions in other circuits have, however, ex-

---

1. The majority opinion cites no decisions of the United States Supreme Court in support of its holding in this regard, and I am aware of none. The decisions from this Circuit relied on by the majority in such connection are *Weiss v. United States*, 122 F.2d 675 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941), and *Blachly v. United States*, 380 F.2d 665 (5th Cir. 1967). In *Weiss* "[t]he scheme was to obtain money fraudulently from the State of Louisiana." 122 F.2d at 679. *Blachly* involved a typical "pyramid" scheme by which individuals were deceived into buying water softeners on the false premise that they could recoup their cost, and more, by commissions on referrals. The language in *Blachly* quoted by the majority is itself a quotation from *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958), in which the defendant cheated on a mail-in

football score prediction contest to win a Cadillac. Each case, in other words, plainly involves obtaining something of material value (in two cases money, in one case an automobile) by deceitful means. The broad language in these cases is plainly expressed in support and amplification of the proposition that "[t]he fraudulent [*i.e.*, deceitful] aspect of the scheme to 'defraud' is measured by a nontechnical standard." *Blachly*, 380 F.2d at 671. This simply harks back to the decision in *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1895), that representations and promises made in connection with the sale of worthless bonds without the intent to carry them out were a scheme or artifice to defraud under the mail fraud statute, though they might not have been common law fraud, which was then assertedly limited to representations of

tended the reach of section 1341 in this regard farther than any decisions of the Supreme Court or of this Court. Nearly all of these decisions are reviewed in the opinion in *United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976), where the Court declined to extend them or to give full reach to the expansive language found in several.

As the *McNeive* opinion reflects, these cases generally involve corruption of public officials. In virtually all of them there was actually or potentially either an economic loss to the government[2] or an economic gain to the defendant.[3] In any event, in all these cases where public officials and employees are corrupted, the government is

past or existing facts. This does not relate to the object of the scheme, or to the requirement that it be calculated to achieve for the perpetrator or deprive the victim of something either tangible or of actual or potential economic value.

In *United States v. States*, 488 F.2d 761 (8th Cir. 1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974), the Court cited, generally in support of the proposition that the scheme need not be calculated to acquire for the perpetrator or deprive the victim of a tangible item or something of actual or potential economic value, among other decisions, those by this Circuit in *Abbott v. United States*, 239 F.2d 310 (5th Cir. 1956); *Shushan v. United States*, 117 F.2d 110 (5th Cir.), *cert. denied*, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941); *Steiner v. United States*, 134 F.2d 931 (5th Cir.), *cert. denied*, 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721 (1943); and *Bradford v. United States*, 129 F.2d 274 (5th Cir.), *cert. denied*, 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547 (1942). None of these cases support that proposition. In *Abbott* the object of the scheme was the acquisition of confidential and highly valuable geophysical maps belonging to Magnolia Petroleum Company and the destruction of "the rightful exclusive enjoyment by Magnolia of its own property." 239 F.2d at 314. While intangible, as well as tangible, *property* was involved, clearly there was a deprivation of property and of economic benefit; the deprivation was not purely of information having no economic value. In *Shushan* the scheme was described as one "to obtain sums of money from the Board" and as "a scheme to defraud and to obtain money by false representations." 117 F.2d at 115. To the extent that *Shushan* has a broad reach, it is in its statement that "[a] scheme to get money" may be within the statute even if it is accomplished by bribery rather than "lies." 117 F.2d at 115. In *Steiner* the defendants "defrauded the State and its taxpayers out of many thousands of dollars." 134 F.2d at 933. In *Bradford* the defendants' scheme was "to sell motor buses to the city at exorbitant prices, so that, from the money fraudulently obtained, the schemers would get unearned profits." 129 F.2d at 275. In three of these cases, then, what the victim was to lose, and the villain to gain, was money, while in the fourth case the object was the victim's valuable maps.

Of course, there is no question of Congress' *power* under the Constitution to make criminal virtually any use of the mails in furtherance of any illegality or scheme contrary to public policy. *Badders v. United States*, 240 U.S. 391, 393, 36 S.Ct. 367, 368, 60 L.Ed. 706, 708 (1916). *See U. S. Postal Service v. Greenburgh Civic Ass'n*, 453 U.S. 114, 69 L.Ed.2d 517, 101 S.Ct. 2676 (1981). But in section 1341 Congress plainly has not approached the limit of its powers in this regard. *Fasulo v. United States,* 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443 (1926); *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). The question, then, is the meaning of the words used in section 1341, as determined in the light of recognized rules for the construction of criminal statutes.

2. *United States v. McNeive*, 536 F.2d 1245, 1250–51 (8th Cir. 1976), points out, for example, that in *United States v. George*, 477 F.2d 508 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973), "the pecuniary loss occasioned by defendant's nondisclosure of the kickback scheme was a significant factor," and in *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976), the "defendant's conduct deprived the City of the opportunity of securing the most economically favorable contract."

3. For example, the *McNeive* opinion, 536 F.2d at 1250–51, characterizes *United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976), as involving a scheme which "constituted an egregious conflict of interest utilized for personal [economic] gain," and *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), as a scheme to obtain by bribery "special favors and preferential treatment" from the government for the donor, which, the *Isaacs* opinion discloses, had considerable economic value.

*United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976), *aff'd in part*, 591 F.2d 1347 (4th Cir. 1979), *aff'd*, 602 F.2d 653 (4th Cir. 1979) (en banc), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), cited by the majority, also falls in this same category.

deprived of something of actual or potential economic worth, namely, the services of the official or employee whose compensation, office and expenses are paid for by the government.

One case which does not fit the foregoing pattern is *United States v. States*, 488 F.2d 761 (8th Cir. 1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). In *States*, while there was apparently no corruption of governmental officials or employees, the scheme involved the use of false voter registration affidavits to procure "absentee ballots for the fictitious persons" "for the purpose of securing . . . said political offices . . . and financial benefits of said offices." 488 F.2d at 762–63. A purpose of "financial" gain was charged in *States*, albeit a rather remote one. Moreover, it was plainly alleged that the immediate purpose of the scheme was to obtain from the government, and for the defendants, specific, tangible items which the government would not have parted with but for the fraud, namely, the absentee ballots for the fictitous persons. *States* therefore involves deprivation of some tangible items.

But it is unnecessary for purposes of this opinion to determine whether cases such as *Isaacs, Mandel* and *States* may properly be viewed as consistent with limiting section 1341 to instances where the scheme contemplates the perpetrator's acquisition or the victim's deprivation of either some tangible thing or some actual or potential economic benefit. Nor is it necessary for these purposes to determine whether these cases should be followed by this Court.[4] Regardless of how intangible and noneconomic the consequences of a scheme to defraud may be for purposes of section 1341, no case has held that the mere denial to the victim of accurate information, which is necessarily implicit in any false or deceitful statement, is of itself sufficient to render the knowingly making of a false statement a defrauding. There must be contemplated some significant detriment to the victim, or benefit to the perpetrator, *apart* from the deception itself. Thus, in *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), the making by defendant's salesmen of knowingly false representations to customers of having been referred by a mutual friend or that the goods were those of a recently deceased friend of the salesman and had to be disposed of because of his death was held not to be a scheme to defraud within section 1341. Though by these knowingly false representations defendant deceived the customers and "secured sales," there was no scheme to "defraud" because the representations were not calculated or intended to affect the customers' understanding of either the bargain or the value of the goods.[5] But, of course, the customers *were* deprived of correct information as

---

4. The *States* decision seems difficult to reconcile with *United States v. Gradwell*, 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (1917), at least on any basis other than as suggested in the preceding paragraph of text. Although *Gradwell* involved a charge under a predecessor to 18 U.S.C. § 371, rather than section 1341, it appears the "defraud" language of the former act has been given a construction certainly as broad, if not indeed somewhat broader, than "defraud" in section 1341. *See* text, *infra*. That *Gradwell* was a case in which the general election for the United States Congress in Rhode Island was to be corrupted by bribing the participating voters, instead of through absentee ballots for nonexistent voters procured by misrepresentation as in *States*, is not a ground for distinction. It has been held that "defraud" under the predecessor to section 371 encompasses bribery as well as misrepresentation. *Haas v. Henkel*, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); *Glasser v. United States*, 315

U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Moreover, *States* seems to give an excessively broad reading to the decisions of this Court, *see* note 1, *supra*, and to ignore the rule requiring strict construction of criminal statutes, especially where the subject matter involves conduct traditionally governed by local law enforcement.

5. The Second Circuit stated:

"[D]efendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970).

to the source of the goods and the occasion for the salesman's call, and they took *some* action on this misinformation, that is, they took the time to listen to the salesman and evaluate the merchandise, rather than simply refusing to even consider a purchase. However, this was not sufficient to invoke section 1341.

If some such limitation is not placed on section 1341 it will reach virtually every knowing misrepresentation mailed with the intent to deceive. But, as *Regent Office Supply Co.* reflects, not every intent to deceive is an intent to defraud. To the same effect is the recent decision of this Court in *United States v. Ballard*, 663 F.2d 534, *modified on rehearing*, 680 F.2d 352 (5th Cir. 1982), which contains a thorough review of the authorities, generally in line with that in the *McNeive* opinion referenced above.

Let us suppose that the Louisiana election law required that the candidates file, within thirty days after the general election, a contributions report covering contributions received during the last two weeks of the campaign. An issue has developed during the campaign as to whether a given candidate is supported by a particular controversial figure. Thirteen days before the election this figure makes a significant, though perfectly legal, contribution to the candidate. There is, in fact, nothing either improper or illegal in the relationship between the candidate and contributor. A local newspaper covering the campaign then "invites" all candidates to submit to it, five days before the election, a report of contributions (following the format of the required state reports) current to ten days before the election. Such "reports" will be published in the paper, along with additional comments, and candidates who fail to provide the information will be vociferously denounced. Knowing that the paper suspects the contribution and will denounce him either if he refuses its invitation to "report" or if his "report" discloses the contribution, the candidate, intending to de-ceive the paper, mails on the seventh day before the election a purportedly complete report which knowingly omits the contribution in question. Prior to the election, the paper publishes the report and endorses the candidate, noting the absence of any contribution from the controversial figure. Many citizens are accordingly influenced to vote for the candidate. Has the candidate violated section 1341? I think not.

Of course, here the election contributions report is a legally required filing with an official body. But that, it seems to me, is indeed a slender basis for distinction. *See United States v. Cohn*, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926). There is no basis in the wording of section 1341 to distinguish between situations where the government (or one of its agencies) is the "victim" and where the "victim" is an individual or nongovernmental entity. Certainly, the "integrity" of the electoral process and the public's "right to know" is at least as meaningfully infringed by the pre-election mailing to the newspaper as by a post-election official filing with the same misinformation. The Louisiana statute does not denounce filing false reports as defrauding, and under Louisiana law the offense is a misdemeanor punishable only by a fine which may not exceed $500 plus an amount equal to one and one-half times the amount not properly reported. *See* Section 1491, Louisiana Election Campaign Finance Disclosure Act. By contrast, a violation of section 1341 is a felony punishable by up to five years' imprisonment. I recognize that state law is not determinative in these matters, but *if* we *do* rely on state law to characterize conduct as being violative of section 1341, then it seems to me appropriate to consider how the state regards such conduct. It does not appear to me that Louisiana regards the knowingly filing of false reports, without more, to be a "defrauding" of the state or the Committee.[6]

6. For example, compare 18 U.S.C. § 371, which provides a penalty of up to five years' imprisonment and a fine of up to $10,000 for conspiracy to defraud the United States. *See United States v. Wiesner*, 216 F.2d 739 (2d Cir. 1954); *Hunsaker v. United States*, 279 F.2d 111 (9th Cir.), *cert. denied*, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960).

Nor do I believe that the decisions of the Supreme Court construing 18 U.S.C. § 371 and its predecessors dictate a result at variance with the above analysis. While such decisions do stand for the proposition that a pecuniary detriment to the United States is not necessary to make out a conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose" contrary to section 371, none of them has gone so far as to hold that the United States is defrauded merely by knowingly furnishing it false information, where, apart from this deception itself, there is no collateral material deprivation or benefit intended.[7] Indeed, the Supreme Court has rejected the predecessor to section 371 as a basis on which to prosecute "fraudulent" interference with the electoral process. *United States v. Gradwell*, 243 U.S. 476, 37 S.Ct. 407, 61 L.Ed. 857 (1917). Moreover, on at least two occasions the Supreme Court has refused to employ its decisions dealing with section 371 as a proper basis for giving a broad construction to other antifraud statutes. *See United States v. Cohn*, 270 U.S. 339, 346–47, 46 S.Ct. 251, 253, 70 L.Ed. 616 (1926) (noting the different context of the statute there involved and stating that "defrauding" was not to be construed "beyond its usual and primary

sense" as "relating to the fraudulent causing of pecuniary or property loss"); *Bridges v. United States*, 346 U.S. 209, 220–21 n.19, 73 S.Ct. 1055, 1062 n.19, 97 L.Ed. 1557 (1953) (distinguishing cases under the predecessor to section 371 on the basis of its broad "in any manner or for any purpose" language).

Similar reasoning also suggests that section 1341 should not be read as broadly as section 371. While the former does denounce "*any* scheme or artifice to defraud" (emphasis added), the word "any" may properly be understood as indicating an expansive reading of "scheme or artifice" rather than "defraud." Accordingly, it is the range of methods, not objects, which is thus broadened. *See, e.g., Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896). By contrast, the words "in any manner or for any purpose" in section 371 unmistakably extend to *both* methods *and* objects, and on any fair reading must be viewed as substantially more expansive than the modifier "any" in section 1341. Moreover, the overall context of section 1341 is plainly directed to defrauding in its usual and primary tangible or economic sense. *See United States v. Cohn*,

7. Representative decisions include the following.

In *Haas v. Henkel*, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910), the defendants bribed employees of the Department of Agriculture to get advance information of its cotton crop estimates. The opinion states that such estimates "are of value and do greatly affect the market price of the crop" and that "the conspiracy was . . . to use such information in speculating upon the cotton market." 216 U.S. at 478, 30 S.Ct. at 253. Plainly the defendants intended by their bribery to get something of economic value; moreover, they deprived the United States of the services of its employees.

*United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), and *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), are each cases in which the defendant officials took bribes to affect criminal prosecution. Each thus involves the United States being deprived of the services of its officials, as well as the contemplated effect on the criminal prosecution.

In *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), union officials allegedly filed knowingly false "non-Communist" affidavits with the N. L. R. B., intending to thereby procure for the union the services of the N. L. R. B. which would otherwise have been unavailable to it. The opinion notes that "[t]he union thereafter proceeded, on several occasions, to utilize the Board's services, a privilege which it had obtained as a result of these assertedly fraudulent acts." 384 U.S. at 859, 86 S.Ct. at 1843. Thus the fraud contemplated that services, presumably of some economic value, would be furnished by the United States to the benefit of defendants' organization.

*United States v. Plyler*, 222 U.S. 15, 32 S.Ct. 6, 56 L.Ed. 70 (1911), involved submitting forged vouchers as to character and physical fitness in connection with meeting the requirements for taking the Civil Service examination. There the United States would be induced to administer and grade the examination, and perhaps employ the defendant, by the fraud, which accordingly contemplated some economic detriment to the government and potential economic benefit to the culprit distinct from the deception itself.

*supra.*[8] The opposite is the case with section 371; there the emphasis is on protection of the United States from "any offense" against it, and "offense" in this connection has been construed to include many civil as well as criminal wrongs. *See United States v. Wiesner*, 216 F.2d 739 (2d Cir. 1954); *Hunsaker v. United States*, 279 F.2d 111 (9th Cir.), *cert. denied*, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960).

With respect to the question of whether defrauding can consist merely of a deceitful interference with governmental functions, it is plain that such a reading is far more congenial to section 371 than to section 1341. The former section has as its sole purpose the protection of the United States, while the latter does not even mention any government as being a victim of defrauding. The text of section 1341 furnishes no basis for distinguishing between a deceitful interference with a governmental function and a similar interference with the function of any other entity. Thus, for example, nothing in the text of section 1341 justifies holding that our hypothetical candidate would not violate that section by his mailing to the newspaper but would if he mailed a similar false report to the Committee. No such problem is present in section 371 prosecutions, for that section is clearly limited to instances where the United States is victimized.

Particularly instructive in this regard is the opinion in *Curley v. United States*, 130 F. 1 (1st Cir.), *cert. denied*, 195 U.S. 628, 25 S.Ct. 787, 49 L.Ed. 351 (1904). This is perhaps the leading early decision rationalizing a broad interpretation of the words "defraud the United States in any manner or for any purpose" in the predecessor to section 371. Curley was charged with a violation of this provision for conspiring with Hughes to defraud the United States by impersonating Hughes at a civil service examination, forging Hughes' name and the like, so that Hughes could obtain employment with the post office.

Though it recognized that the indictment charged an intended economic harm to the United States ("[i]t is difficult to see why a conspiracy to wrongfully secure a statutory salary from the government, through fraudulent impersonation, stands differently than a conspiracy to fraudulently procure a pension from the government . . ."; *id.* at 13), the Court nevertheless expressed at some length its view that, under this particular statute, the words "defraud the United States . . . for any purpose" were not restricted by the concept of economic harm. The opinion is at pains to distinguish statutes prohibiting defrauding generally, where the only wrongful conduct denounced is defrauding but the class of victims is unlimited, from the predecessor to section 371, which deals with all offenses against the United States as well as defrauding it, but has as its beneficiary only the United States.[9]

More specifically, the Court goes on to indicate that where the victims protected are generally defined, "defraud" would properly have a narrower construction, *even*

---

**8.** Analogous reference to the nature of other subjects dealt with by a statute to determine the meaning of the words dealing with a particular subject at issue is seen in *Third National Bank v. Impac Limited, Inc.*, 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368, 376 (1977).

**9.** The opinion states:
"... the sections in question only assume to deal with wrongs against the federal government, and expressly describe conspiracies to commit offenses against the United States and conspiracies to defraud the United States, thus limiting the subject-matter of the legislation to matters concerning the federal government alone; and, while the language is general as to persons and conspiracies, the subject with which the statute assumes to deal limits its scope to conspiracies to commit offenses against the United States and conspiracies to defraud the United States. Criminal statutes of a state are general in the sense that they operate upon all members of the public and for the protection of all. The statute in question is general in the sense that it operates upon all in respect to subjects which concern the federal government alone, and for the protection of a single entity alone, that of the government." *Curley v. United States*, 130 Fed. at 5–6.

*though the general class of victims includes local governments:*

> "Quite likely the word 'defraud,' as ordinarily used in the common law, and as used in English statutes and in the statutes of our states, enacted with the object of protecting property and property rights of communities and individuals, *as well as of municipal governments,* which exist largely for the purpose of administering local financial affairs, *has reference to frauds relating to money and property.* If this is so, it is because the word is used in that sense, but it may well enough have a broader sense, and be used for a broader purpose." *Id.* at 6–7 (emphasis added).

On the other hand, where the *sole* purpose of the statute was to protect the government, a broader reading should be given.[10]

In sum, *every* reason given in *Curley* for a construction of the predecessor to section 371 so as not to limit its use of "defraud" to

instances where tangible or economic loss is contemplated supports a construction of section 1341 which *does* so limit its use of "defraud." The majority opinion has in effect stood the *Curley* rationale on its head.

While the analysis made in *Curley* furnishes persuasive support for its construction of the predecessor to section 371, it must be noted that such construction is not without many serious problems. *See* A. Goldstein, *Conspiracy To Defraud The United States,* 68 Yale Law Journal 405 (1959). To extend such a construction to section 1341 is not only to act without the support of the reasons given in *Curley,* and indeed contrary to every rationale of *Curley,* but is to add to the problems inherent in section 371 those posed by a significant expansion of federal law enforcement into matters of traditionally local concern, all without a clear command from Congress to do so.

---

**10.** As the *Curley* Court suggests,

"A statute which, in general terms, has for its object the protection of the individual property rights of the members of the civic body, is one thing; a statute which has for its object the protection and welfare of the government *alone,* which exists for the purpose of administering itself in the interests of the public, might be quite another thing. The purpose might be broadly different in the two cases.

"The personal rights and interests of individual members of society needing protection are one thing; the rights and interests of a government needing protection are quite another thing. This results from the fact that the rights and interests of individuals and governments are different. The individual rights relate to life, liberty, and the pursuit of happiness, and the right to acquire and hold property. Governments are instituted for the purpose of protecting such individual rights, and they may protect themselves for that purpose and safeguard their own existence. Therefore the word 'defraud' may have a different meaning in a statute for the protection of the government and its administration than when used in a statute designed for the protection of personal rights.

" . . . .

"In considering a statute *enacted for the protection of the government,* an entity which, in its right to render service to the people under wise and beneficent laws, holds property only as an incident of governing, and which declares it a penal offense to conspire to defraud the government *for any purpose,* we need not necessarily, we think, ap-

proach the question of the interpretation of the word 'defraud' from the same standpoint from which the question would be considered if the word 'defraud' were used in a state statute enacted for the protection of ordinary property rights of individuals constituting a state; and this is so for the reason that in the one instance the statute in its ordinary acceptation has reference to property and property rights alone, while in the other it has reference to a broader purpose, that of protecting the government in its administration under the law, as well as protecting the property of the government which it holds as an incident to the fundamental purpose for which the government was instituted." *Id.* at 7–8 (emphasis added).

The Court's opinion also reflects the significance to a broad construction of "defraud," of the "for any purpose" language and of the fact that the commission of any offense against the United States is an alternative object of the conspiracy denounced by the statute:

"The statute thus clearly and expressly carries its provisions *beyond wrongs which had been expressly declared to be offenses* against the United States, and extends its provisions so as to embrace fraud in any manner *for any purpose,* and it would *thus* seem apparent that it was intended by Congress to carry the meaning of the statute beyond frauds in respect to property and property rights by declaring against fraud *for any purpose* . . . ." *Id.* at 4 (emphasis added).

We are dealing here with what is, essentially and traditionally, a matter of local concern—compliance with local law requirements for campaign contributions reporting—normally handled by local authorities. By contrast, a prosecution under section 371 for conspiracy to defraud the United States obviously relates to a matter which is essentially of national concern. The Supreme Court has on at least two occasions admonished us that the rule requiring a strict construction of criminal statutes is of special force where a broader construction "renders traditionally local criminal conduct a matter for federal enforcement," *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 523, 30 L.Ed.2d 488, 498 (1971), or "would alter sensitive federal-state relationships" or "transform[s] relatively minor state offenses into federal felonies." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493, 497 (1971).

I do not dispute that the word "defraud" can be stretched just about as far as one wants to stretch it. But to apply it in the context of section 1341 to the mere knowingly giving of false information to a governmental agency, without more, is indeed to stretch it not only beyond but indeed almost out of sight of its "usual and primary sense." Such an interpretation is simply irreconcilable with the long-settled rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S. at 812, 91 S.Ct. at 1059. *See also Williams v. United States,* —— U.S. ——, ——, 102 S.Ct. 3088, —— 73 L.Ed.2d 767 (1982). It cannot be doubted that the rule of strict construction is applicable to section 1341. *Fasulo v. United States,* 272 U.S.

620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443, 445–46 (1926); *United States v. Edwards,* 458 F.2d 875, 880 (5th Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972). As *Bass* and *Rewis* teach us, it is especially applicable in this sort of setting because a broader construction "renders traditionally local criminal conduct a matter for federal enforcement," 404 U.S. at 350, 92 S.Ct. at 523, alters "sensitive federal-state relationships" and "transform[s] relatively minor state offenses into federal felonies." 401 U.S. at 812, 91 S.Ct. at 1059. Accordingly, I cannot agree with the majority that the mailing to the Louisiana Committee of any knowingly false contribution report violates section 1341, where there is no fraud or illegality (such as either an illegal contribution or a wrongful diversion of funds contributed), nor any deprivation or advantage, apart from the giving of the incorrect information and the necessarily concomitant concealment of the correct information. That such conduct is reprehensible goes without saying. Indeed it is criminal under Louisiana law, and may be prosecuted by Louisiana authorities. But in my opinion it is not defrauding and does not violate section 1341.